IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 7, 2009 Session

## LOU ELLA SHERRILL ET AL. v. BOB T. SOUDER, M.D. ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Madison County**
**No. C04-5    Donald H. Allen, Judge**

---

**No. W2008-00741-SC-R11-CV - Filed October 28, 2010**

---

This litigation involves a claim of medical malpractice against the two defendants, a physician and the corporation operating his clinical practice, alleging negligence in the prescription of a drug. The trial court granted the defendants' motion for summary judgment on grounds that the suit was barred by the one-year statute of limitations. The Court of Appeals affirmed. The question before the Court is the propriety of summary judgment on statute of limitations grounds. Although the trial court properly concluded that the cause of action accrued more than a year before the suit was filed, there is a genuine issue of material fact regarding whether the plaintiff was of unsound mind on the date the cause of action accrued, thus tolling the limitations period. Because the suit was not time-barred as a matter of law, the grant of summary judgment must be reversed. The cause is remanded to the trial court for proceedings consistent with this opinion.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed and Case Remanded**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Edmund J. Schmidt, III and David Randolph Smith, Nashville, Tennessee, for the appellant, Barbara Pigg.

Jeffrey L. Lay, Dyersburg, Tennessee, for the appellees, Bob T. Souder, M.D. and TransSouth Health Care Center, P.C.

**OPINION**

This medical malpractice suit was filed by Lou Ella Sherrill and her daughter, Barbara

Pigg, against Bob T. Souder, M.D. and TransSouth Healthcare, P.C., a corporation in which Dr. Souder is the sole shareholder (hereinafter "the Defendants"). Ms. Pigg was dismissed as a party, but later filed a motion to amend the complaint to substitute herself as the plaintiff after Ms. Sherrill's death. Before considering the motion to amend, however, the trial court granted summary judgment to the Defendants, finding that the suit was filed after the one-year limitations period for medical malpractice actions had passed and that Ms. Sherrill was not suffering from any disability that would justify tolling the statute of limitations. The Court of Appeals affirmed the judgment of the trial court.

### Facts and Procedural History[1]

On March 11, 2002, Lou Ella Sherrill, an 80-year-old resident of Willow Springs, Missouri, sought treatment for uncontrolled vomiting at the Tucker Clinic in Jackson. Ms. Sherrill, a diabetic who had just been released from hospitalization after a bout with pneumonia, was visiting her daughter, Barbara Pigg, a Tennessee resident. Michael Briley, a nurse practitioner at the Tucker Clinic, conducted an examination of Ms. Sherrill and prescribed a daily dosage of thirty milligrams of Reglan, a drug also known by the generic name metoclopramide. The prescription was filled at a local pharmacy. Because Ms. Sherrill's symptoms did not immediately subside, she was referred to the Digestive Disease Clinic in Jackson, where, on March 18, she received an abdominal ultrasound.

On March 20, Ms. Sherrill was treated by Dr. Bob Souder, a gastroenterologist and the sole shareholder of TransSouth Healthcare, a professional corporation that owned and operated both the Tucker Clinic and the Digestive Disease Clinic. After performing an upper panendoscopy, Dr. Souder made a diagnosis of severe gastroesophageal reflux disorder, a hiatal hernia, and possible gastroperisis and, because of the severity of Ms. Sherrill's condition, informed Ms. Pigg that she "was a very lucky lady that her mother was alive." Because Ms. Sherrill had not responded to the amount of Reglan that the nurse practitioner had prescribed, Dr. Souder, who regularly prescribed Reglan as "the drug of choice" for the treatment of gastroesophageal reflux disorder, doubled the dosage to sixty milligrams per day.

Dr. Souder increased the Reglan dosage for one month, with refills for five additional months, on his assumption "that . . . [his clinic] would be following [Ms. Sherrill] more

---

[1] Because this case was decided on a motion for summary judgment, these facts have been drawn from the pleadings and the evidentiary materials filed in support of and opposition to the summary judgment motion, including the sworn testimony taken during the discovery depositions of Barbara Pigg, Dr. Bob Souder, and Dr. Clara Applegate.

closely."[2]  Ms. Sherrill did have one follow-up visit with a nurse practitioner at the clinic on April 18 and reported that her nausea and vomiting had ceased.  Shortly thereafter, she returned to her residence in Missouri.  Dr. Souder's medical records pertaining to Ms. Sherrill's treatment were sent to Dr. Raymond Lewandowski, a family physician in Missouri. A home health agency visited Ms. Sherrill's residence weekly and placed the Reglan into a medication planner.  Ms. Sherrill, however, had the responsibility to take her medications at the appropriate intervals.

On May 22, 2002, just over a month after her last visit to the Digestive Disease Clinic, Ms. Sherrill made an appointment with Dr. Lewandowski because of a facial droop and slurred speech.  After reporting that she had developed a tremor in her legs and a chewing motion in her mouth, she mistakenly informed Dr. Lewandowski that her sister had suffered from Parkinson's disease.  Although Ms. Sherrill continued to be treated by Dr. Lewandowski throughout that summer, Ms. Pigg, still in Tennessee, was apparently unaware of the extent of the new symptoms until a mid-August visit to her mother's Missouri residence.  At that point, she described Ms. Sherrill's leg movements as "drastic" and "just constant, like she was kicking straight up," and her chewing motion as "like she had gum in her mouth."  Concerned about her mother's condition, Ms. Pigg accompanied her to an August 26 appointment with Dr. Lewandowski, at which time she explained to him that Ms. Sherrill's sister never had Parkinson's disease.

In the fall of 2002, Ms. Sherrill's original six-month prescription for Reglan was refilled.  According to Ms. Pigg, Dr. Souder's office had authorized the renewal at the request of a pharmacy in Missouri.  Dr. Souder's office, however, had no record of the renewal, and he contended that his office's protocol would not have permitted a renewal of a prescription over the telephone after six months' time without a personal examination. Regardless of how the prescription was refilled, it is undisputed that Ms. Sherrill continued to ingest the full sixty-milligram dose of Reglan throughout the fall of 2002.  It is also undisputed that her neurological symptoms continued to worsen.

The record indicates that Dr. Lewandowski made no connection between Ms. Sherrill's use of Reglan and her movement disorder.  In November, however, after prescribing several different medicines in an unsuccessful effort to combat Ms. Sherrill's Parkinson's-like symptoms, Dr. Lewandowski referred Ms. Sherrill to Dr. Clara Applegate, a neurologist at the Neurosciences Center of the Ozarks Medical Center in West Plains, Missouri. On December 18, 2002, Ms. Sherrill was examined first by a physician's assistant

---

[2] The record is unclear as to the length of the initial non-refillable prescription that the nurse practitioner, Briley, had written.  Ms. Sherrill finished all of the medication prescribed by the nurse practitioner before she filled Dr. Souder's prescription.

("P.A."), Brian Lenihan, and then by Dr. Applegate. According to Ms. Pigg, she "didn't even know [her mother] was going until it was done"; however, Dr. Applegate expressed her belief that Ms. Pigg was present during the initial visit and had also accompanied Ms. Sherrill to all of her subsequent appointments. On further questioning, Dr. Applegate stated that while "Ms. Sherrill came to the first visit and wrote her own notes . . . [,] after that her daughter sort of jumped in and took over." The medical records taken during this first visit make no reference to Ms. Pigg's presence, while the records from each of Ms. Sherrill's subsequent appointments document her attendance.

The impression of P.A. Lenihan and Dr. Applegate at the December 18 appointment was that Ms. Sherrill suffered from tardive dyskinesia, a movement disorder that is triggered by certain medications. Both the physician and the P.A. suspected that Reglan was the source of her disorder. The physician's notes of that visit included instructions for her office to "contact[] the nursing agency to stop the [m]etoclopramide," and also indicate that "Dr. Applegate shared with the patient that stopping this medication is important." At her deposition, Dr. Applegate was further questioned about the December 18 appointment, which led to the following exchange:

> Q: Now let me ask you a little more about your conversation with Mrs. Sherrill and her daughter on December 18, 2002. Did you tell them that . . . you thought she had tardive dyskinesia?
> A: I think I probably did. I probably said, <u>no, I didn't. I wouldn't have said that.</u> I would have said–
> Q: What would you have told them?
> A: <u>I would have told them that I thought she had a movement disorder that might have been triggered by the medication and that stopping the medication might take care of it.</u>
> Q: In having such a conversation would you emphasize to the patient, and in this case did you emphasize to the patient the importance of stopping the Reglan?
> A: Yes.
> Q: Did you go into any detail at that time or give them any explanation as to how Reglan or other drugs can cause this movement disorder?
> A: <u>I explained that any exposure to these medications can trigger such a disorder and that the side effects look like Parkinson's Disease in many cases and I felt that was what was wrong with her.</u>

(Emphasis added).

Despite the instructions by Dr. Applegate to discontinue the use of Reglan, Ms.

Sherrill continued to take the drug at the same dosage until her next visit with Dr. Applegate on January 16, 2003. It is undisputed that Ms. Pigg accompanied her mother to this appointment. The physician's notes of this visit provide that "despite over two phone calls and a faxed order" to the nursing agency, Ms. Sherrill had continued to take the Reglan. Dr. Applegate's medical records confirm that Ms. Sherrill still exhibited signs of movement disorder and that Ms. Pigg described her mother's symptoms at this time as "about the same . . . still violent." According to Dr. Applegate, Ms. Sherrill's continued use of Reglan after the office visit on December 18 delayed her recovery from tardive dyskinesia.

Based upon the January 16 visit, Dr. Applegate wrote "another order to stop the metoclopramide," as well as "a specific order that the daughter may take to the nursing staff at the home health agency." Ms. Pigg delivered the doctor's order directly to the nursing agency, removed the Reglan prescription from her mother's medication bag, and arranged immediate discontinuation of use. Ms. Pigg testified by deposition that she was not aware until the January 16, 2003 visit that Reglan might be a possible cause of Ms. Sherrill's tardive dyskinesia, that Ms. Sherrill should stop taking the Reglan, or that Dr. Applegate's office tried to suspend her use of the drug after the December 18 appointment. Ms. Pigg acknowledged, however, that she had called the Tucker Clinic in Jackson on January 13, 2003, to inform Mike Briley that her mother had been diagnosed with tardive dyskinesia and to inquire about what drug should be prescribed in lieu of Reglan. Dr. Applegate's notes of the January 16 appointment, which state that Ms. Pigg "checked with a doctor in Memphis, actually a nurse practitioner that is a friend that helped treat her before," appear to call into question Ms. Pigg's statement that she had no knowledge of the diagnosis prior to January 16.[3]

In the ensuing months, Ms. Sherrill continued to receive treatment from Dr. Applegate and P.A. Lenihan for her tardive dyskinesia. The doctor's notes from Ms. Sherrill's February 20, 2003 appointment indicate that Ms. Pigg "br[ought] in information from the internet about tardive dyskinesia and a specific memory loss or dementia that is associated with tardive dyskinesia." Dr. Applegate testified that Ms. Sherrill's condition steadily improved during this time. Ms. Pigg, however, asserted that the disorder subsided, but did not end, after discontinuation of the Reglan, and that her mother's quality of life deteriorated as a result of tardive dyskinesia, rendering her "too tired to care" about activities she had once enjoyed, such as gardening, quilting, and taking classes.

At the first appointment on December 18, 2002, Dr. Applegate diagnosed Ms. Sherrill

---

[3] We are cognizant that "[i]ssues of witness credibility present issues of fact and must be construed in favor of a nonmoving party when considering a motion for summary judgment." Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ., 244 S.W.3d 302, 320 (Tenn. 2007).

not only with tardive dyskinesia, but also with some form of memory loss, described as an "early senile dementia of Alzheimer's type." Dr. Applegate corroborated her notes by deposition, testifying that while she "did not do a full mental status evaluation" on December 18, "at that time the patient and her daughter were concerned that she had memory loss." Dr. Applegate expressed the view that Ms. Sherrill "probably had some Alzheimer's disease," and recalled that "the family and the patient told me that she was having problems with her memory [which] was starting to fail." Later in her deposition, Dr. Applegate stated that "Ms. Sherrill . . . though . . . demented, was a pretty sharp individual and had a good sense of humor." On January 6, 2003, less than three weeks after her initial appointment with the neurologist, Ms. Sherrill executed a durable power of attorney authorizing her daughter to make all of her medical decisions. During her deposition, Ms. Pigg testified that the decision to execute the power of attorney was made "after [Ms. Sherrill] was diagnosed with the tardive dyskinesia and . . . [P.A.] Len[i]han . . . talked to her about that and a dementia she had. And she felt like this was something she should do while her mind was still clear."

The medical notes from the January 16, 2003 appointment with Dr. Applegate indicate that while Ms. Sherrill had "clear speech and full comprehension," a test administered to determine [her] mental status resulted in "a total score of 21/30, which is moderate to severe Alzheimer's." Ms. Pigg stated at her deposition that while she had "[n]ot really" noticed any changes in her mother's mental status by the January 16 appointment, P.A. Lenihan informed her at the appointment that Ms. Sherrill had failed a test for Alzheimer's and had a form of dementia. Ms. Sherrill continued to live alone during this period, although her in-home care increased during 2003 and into early 2004. By April of 2004, a home health agency stayed with Ms. Sherrill ten hours per week, her meals were being prepared for her, and her daughter paid her bills. In June of 2004, Ms. Pigg described her mother's mental status as "fair."

On January 8, 2004, Ms. Sherrill and Ms. Pigg filed a medical malpractice claim against the Defendants in the Circuit Court for Madison County. The complaint alleged that the Defendants had breached the professional standard of care by prescribing to Ms. Sherrill a high dose of Reglan over several months, failing to warn her of the potential side effects of the drug, and failing to properly follow up with her after the initial prescription. In answering the complaint, the Defendants alleged as an affirmative defense that the cause of action was barred by the one-year limitations period for medical malpractice actions in Tennessee. See Tenn. Code Ann. § 29-26-116(a)(1) (2000). Afterward, the Defendants filed a motion for summary judgment contending that the suit was not timely filed and arguing that "both Ms. Sherrill and Ms. Pigg knew or should have known [on December 18, 2002] that Ms. Sherrill's movement disorder was tardive dyskinesia that was caused by Ms. Sherrill taking the drug Reglan . . . prescribed by the defendants." In opposition to the motion, Ms. Pigg submitted an affidavit asserting that she was absent from the December 18, 2002

appointment, which was significant "in light of Ms. Sherrill's memory loss." Moreover, although Ms. Pigg acknowledged that Dr. Applegate's P.A. had told her on January 16, 2003 "that her mother should discontinue ingesting Reglan/[m]etoclopramid[e] and that her use of this medication may be causally related to the neurological symptoms he described as tardive dyskinesia," "[a]t no time did P.A. Lenihan or Dr. Applegate inform [her], or suggest, that Dr. Bob Souder's long[-]term prescription of Reglan/[m]etoclopramid[e] to [Ms.] Sherrill constituted a breach of the professional standard of care." Ms. Pigg claimed that she did not discover the possible negligence "until she conducted her own internet research on tardive dyskinesia months later in the late spring or early summer of 2003."

On January 8, 2007, the trial court granted a motion to dismiss all of Ms. Pigg's individual claims. Subsequently, on September 26, 2007, Ms. Sherrill died. As a result, Ms. Pigg filed a motion to amend the complaint to substitute herself as the plaintiff.[4] The trial court did not act upon the motion to amend prior to granting the Defendants' motion for summary judgment. The order granting the summary judgment motion contained the following findings:

> [T]hat Ms. Sherrill's cause of action accrued and the one year statute of limitations commenced to run on December 18, 2002; that the Complaint was filed more than one year later on January 8, 2004; and, that Ms. Sherrill was not suffering from any disability at the time the cause of action accrued which would justify a tolling of the statute of limitations.

Ms. Pigg filed a notice of appeal, and the Court of Appeals affirmed, citing her deposition testimony that Ms. Sherrill knew about the diagnosis of tardive dyskinesia on January 6, 2003, the date that the durable power of attorney was executed. Sher[r]ill v. Souder, No. W2008-00741-COA-R3-CV, 2009 WL 499337, at *5 (Tenn. Ct. App. Feb. 27, 2009). The Court of Appeals determined that "[g]iving every inference in favor of . . . the non-moving party, at latest, [Ms. Sherrill] knew about the diagnosis on January 6, 2003," making untimely the complaint filed on January 8, 2004. Id. We granted this appeal to determine if there is a genuine issue of material fact regarding whether this medical malpractice action was timely filed.[5]

---

[4] Such motions are contemplated by Tennessee Rule of Civil Procedure 25.01(1), which states that "[i]f a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by . . . the successors or representatives of the deceased party . . . ."

[5] We are not the first state court to construe our jurisdiction's discovery rule in a medical malpractice suit including allegations that a prescription violated the standard of care and led to the development of

(continued...)

## Analysis
### I. The Discovery Rule in Medical Malpractice Actions
### A. Applicable Law

This lawsuit was filed pursuant to Tennessee's medical malpractice statute. See Tenn. Code Ann. § 29-26-115 to -122 (2000 & Supp. 2010). Medical malpractice actions are subject to a one-year limitations period, which begins on the date the cause of action accrues. Tenn. Code Ann. § 29-26-116(a)(1) (referring to Tenn. Code Ann. § 28-3-104 (2000)). In Teeters v. Currey, 518 S.W.2d 512, 517 (Tenn. 1974), this Court adopted the majority rule among the states that a medical malpractice action does not accrue until "the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." The Court concluded that no rule of law should require "that a plaintiff file suit prior to knowledge of his injury or . . . sue to vindicate a non-existent wrong, at a time when [the] injury is unknown and unknowable." Id. at 515; see also Foster v. Harris, 633 S.W.2d 304, 305 (Tenn. 1982) ("The so-called 'discovery doctrine' was fashioned to alleviate the intolerable result of barring a cause of action by holding that it 'accrued' before the discovery of the injury or the wrong.").

One year after our opinion in Teeters, the General Assembly codified the discovery rule as part of the Medical Malpractice Review Board and Claims Act of 1975, ch. 299, § 15(a), 1975 Tenn. Pub. Acts 662, 671, which instituted both the one-year statute of limitations and a three-year statute of repose in medical malpractice actions. The language enacted in 1975 is nearly identical[6] to the current form of the discovery rule: "In the event

---

[5](...continued)
tardive dyskinesia. See, e.g., Sutherland v. Estate of Ritter, 959 So. 2d 1004 (Miss. 2007) (affirming dismissal of complaint alleging that psychiatrist's prescription of Zyprexa caused patient to develop tardive dyskinesia); Fjetland v. State, No. 52150-1-I, 2004 WL 1966042 (Wash. Ct. App. Sept. 7, 2004) (affirming dismissal of complaint alleging that prescription of neuroleptic medications by doctors at state hospital facility led to development of tardive dyskinesia).

[6] Section 15(a) of the Medical Malpractice Review Board and Claims Act of 1975 states as follows:

The statute of limitations in malpractice actions shall be one year as set forth in TCA Section 28-304; provided, however, that in the event the alleged injury is not discovered within the said one year period, the period of limitation shall be one year from the date of such discovery; provided further, however, that in no event shall any such action be brought more than three years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant in which case the action shall be commenced within one year after discovery that the cause of action exists; and provided still further that the time limitation herein set forth shall not apply in cases where

(continued...)

the alleged injury is not discovered within such one (1) year period, the period of limitation shall be one (1) year from the date of such discovery." Tenn. Code Ann. § 29-26-116(a)(2). The application of this seemingly innocuous provision has been the focus of voluminous litigation in Tennessee since its enactment.

This Court first interpreted the scope of the discovery rule in medical malpractice cases in Foster v. Harris. In Foster, a dentist lacerated both his own finger and his patient's lip during an October 1975 examination, which caused their blood to intermingle. 633 S.W.2d at 304. The patient was diagnosed with serum hepatitis three months later, but he did not discover until July of 1976 that his dentist was the likely source of the disease. Id. This Court concluded that the patient's complaint filed in February of 1977 was timely because the limitations period started not with the diagnosis, but when the patient discovered the connection between the disease and his dentist. Id. at 304-05. In so holding, the Court observed that "[i]t is axiomatic that no judicial remedy was available . . . until [the patient] discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the [individual] who breached the duty." Id. at 305.

The two-part test adopted in Foster has produced divergent results based upon the facts of the cases in which it has been applied. For example, in Roe v. Jefferson, 875 S.W.2d 653, 658 (Tenn. 1994), the Court held that a suit filed against a psychologist by a former patient was barred by the statute of limitations. Roe had engaged in a sexual relationship with her therapist for over a year when she learned that the therapist was being investigated by the Tennessee Board of Examiners in Psychology in connection with a sexual relationship he had with another patient. Id. at 654. As part of her inquiry into the potential ramifications of the affair, Roe attended a Board meeting in October of 1988 involving a different psychologist who was accused of engaging in a sexual relationship with a patient. Id. At this meeting, the patient learned that sexual contact in a patient-therapist relationship was unethical, violated Board regulations, and could result in the loss of a therapist's license. Id. at 658. Because she had discovered or should have discovered the breach of duty at the October 1988 Board meeting, the statute of limitations barred her complaint filed in February of 1990. Id.

---

[6](...continued)

a foreign object has been negligently left in a patient's body in which case the action shall be commenced within one year after the alleged injury or wrongful act is discovered or should have been discovered.

1975 Tenn. Pub. Acts 662, 671 (emphasis added).

In Roe, the Court referred to the concept of "inquiry notice" as part of our discovery rule, observing that "'the statute is tolled only during the period when the plaintiff has no knowledge at all that a wrong has occurred, and, as a reasonable person is not put on inquiry.'" Id. at 656-57 (quoting Hoffman v. Hosp. Affiliates, 652 S.W.2d 341, 344 (Tenn. 1983)). "It is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a 'right of action.'" Roe, 875 S.W.2d at 657. Rather, "the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct."[7] Id. Because it was undisputed that the Board meeting Roe attended provided her with information that was sufficient, as a matter of law, to put her on notice, her complaint was untimely.

In Stanbury v. Bacardi, 953 S.W.2d 671, 673 (Tenn. 1997), a podiatrist, who had received permission from Stanbury to perform surgery on only one foot, operated on both of her feet. Stanbury, who expressed "complete and utter shock" at the extent of the procedure, nevertheless continued under the care of the same podiatrist for a period of five months, until he told her "that there was nothing more he could do for her." Id. Confirming that under the discovery rule, the limitations period "begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know, that an injury has been sustained," id. at 678, this Court concluded that Stanbury's suit for medical malpractice filed eleven months after she was discharged as a patient was untimely because

> shortly after the surgery, [she] was aware of facts sufficient to put a reasonable person on notice that she had suffered an injury as a result of wrongful conduct. Not only was she aware of the occasion, manner, and means by which the breach of duty producing her injuries occurred, she also knew the identity of the person who breached the duty.

---

[7] The Iowa Supreme Court has described "inquiry notice" with respect to its state's discovery rule in medical malpractice cases as follows:

> Inquiry notice plays a role in the medical malpractice statute due to the implied knowledge ("should have known") component of the statute. This component charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed. Under the statute, once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate "the injury," the limitation period begins to run. The acquisition of this information is notice that imposes a duty to make a factual inquiry into the existence of the injury.

Rathje v. Mercy Hosp., 745 N.W.2d 443, 461 (Iowa 2008) (citations omitted).

Id. at 677. The Court rejected Stanbury's contention that the inquiry notice begins only upon advice from another health care professional that a medical malpractice action may exist. Id. at 678.

Applying the same standard, the Court reached a different outcome in Shadrick v. Coker, 963 S.W.2d 726, 728 (Tenn. 1998), a case involving an orthopedic surgeon who had inserted "pedicle screws" into his patient's back without first obtaining his consent. Six months after the surgery, one of the screws broke, and afterward, all of the screws were removed. Id. at 729. Shadrick continued to experience pain in his back for years following the surgery, but the surgeon, when asked for an explanation, described the insertion of the screws as "routine treatment." Id. at 728-29. In December of 1993, nearly four years after the surgery, Shadrick saw a television program on pedicle screws, learning for the first time that they "were experimental, . . . had not been approved by the Food and Drug Administration for use in the spine, and . . . had been found to cause a number of problems in patients." Id. at 729. Almost one year after seeing the television program, Shadrick filed suit. Id. Observing that "'[i]t is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial," id. at 734 (quoting Stanbury, 953 S.W.2d at 678), and that "[s]uch knowledge includes not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury," Shadrick, 963 S.W.2d at 734, this Court held that there was "a question of fact regarding whether Shadrick could have discovered the wrong . . . through the exercise of reasonable care and diligence." Id. at 737. Because "a jury could find that Shadrick had no reason to suspect that he sustained an injury resulting from Dr. Coker's wrongful or tortious conduct until December 1993," id. at 735, "disputed issues of material fact exist[ed] regarding when the statute of limitations began to run," making summary judgment inappropriate. Id. at 737.

Most recently, in Terry v. Niblack, 979 S.W.2d 583, 585 (Tenn. 1998), a laboratory negligently performed a blood test that erroneously excluded a child's biological father as a paternity candidate. The mother learned the results of the test in May of 1994. Id. at 585. A second test, the results of which were reported in June of 1995, identified the biological father accurately, a fact confirmed by separate court proceedings in October of 1995. Id. Because the mother's cause of action for negligence against the laboratory accrued when she learned the results of the second blood test,[8] this Court rejected the laboratory's argument that the limitations period began when the mother's attorney was informed that there had

---

[8] Although the Court in Terry applied the one-year medical malpractice statute to the plaintiff's claim, we have since held that a claim regarding blood testing to determine paternity does not sound in medical malpractice, but rather in ordinary negligence. Gunter v. Lab. Corp. of Am., 121 S.W.3d 636, 641 (Tenn. 2003). Where the alleged injuries from negligent testing are economic, the three-year limitations period for injuries to property applies. Id. at 642; see Tenn. Code. Ann. § 28-3-105 (2000).

been a "problem" with the first blood test. Id. at 586-87.

In summary, a medical malpractice cause of action accrues when one discovers, or in the exercise of reasonable diligence should have discovered, both (1) that he or she has been injured by wrongful or tortious conduct and (2) the identity of the person or persons whose wrongful conduct caused the injury. A claimant need not actually know of the commission of a wrongful action in order for the limitations period to begin, but need only be aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another. If enough information exists for discovery of the wrongful act through reasonable care and diligence, then the cause of action accrues and the tolling of the limitations period ceases. Neither actual knowledge of a breach of the relevant legal standard nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a medical malpractice cause of action.

### B. Application of the Law

As a matter of policy, our discovery rule stakes out a sensible middle ground that protects both those making claims, by ensuring that the period during which a malpractice suit can be filed does not expire before discovery, and those against whom claims are made, by preventing the prosecution of stale medical malpractice claims. The cause of action accrues on inquiry notice of a wrongful act. See, e.g., Rathje, 745 N.W.2d at 452-53 ("Most state courts, as we did . . . triggered the discovery rule upon knowledge of the cause of action, including at least some knowledge that the conduct of the physician was negligent or wrongful.").[9] In this case, Ms. Pigg claims that "[i]t is only when the plaintiff learns that the injury is due to tortious or wrongful conduct [that] the statute of limitations begin[s] to run," citing our statement in Shadrick that the knowledge of facts sufficient to constitute inquiry notice "includes . . . the tortious origin or wrongful nature of that injury." 963 S.W.2d at 374. In our view, however, this statement means only that the knowledge of a wrongful act is

---

[9] See also Bussineau v. President & Dirs. of Georgetown Coll., 518 A.2d 423, 430-35 (D.C. 1986) (citing several state supreme courts that "have concluded that at least some knowledge of 'wrongdoing' (i.e., actionable harm), on the part of a defendant is necessary to commence the running of the statute of limitation in a negligence action"); Sutherland, 959 So. 2d at 1008 ("[I]n medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, should have first discovered the negligence, rather than the injury."). But see United States v. Kubrick, 444 U.S. 111, 122 (1979) (determining that the limitations period under the Federal Tort Claims Act begins to run when the plaintiff merely knows of the injury and its cause, because with that knowledge comes the responsibility to determine "if the defendant has failed to live up to minimum standards of medical proficiency"); Wilson, 964 A.2d at 364 (observing that "Pennsylvania's formulation of the discovery rule reflects the narrower of the two overarching approaches to determining accrual for limitations purposes," which requires "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause").

enough to trigger the limitations period. Actual knowledge of tortious conduct is not required before a medical malpractice claim accrues.

This medical malpractice action was filed on January 8, 2004. Applying Tennessee Code Annotated section 29-26-116(a)(1) and (2) and the case law interpreting those provisions, the suit is time-barred if, by January 8, 2003, Ms. Sherrill knew or reasonably should have known that the Defendants breached the duty of care and thereby caused her to develop tardive dyskinesia. In other words, if by January 8, 2003, Ms. Sherrill was aware of facts sufficient to place a reasonable person on notice that her tardive dyskinesia was the result of the Defendants' actions such that she could have discovered the breach of the standard of care through reasonable care and diligence, then barring a tolling of the limitations period, her suit is untimely. Because the failure to comply with a statute of limitations is an affirmative defense, see Tenn. R. Civ. P. 8.03, the Defendants bear the burden of proof on the issue. Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677, 684 (Tenn. Ct. App. 1999); Carr v. Borchers, 815 S.W.2d 528, 532 (Tenn. Ct. App. 1991).

The trial court granted the Defendants' motion for summary judgment on the statute of limitations issue. Our review of a trial court's entry of summary judgment is a question of law. As such, we attach no presumption of correctness to the trial court's decision, and we must review the record de novo to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. In re Estate of Davis, 308 S.W.3d 832, 837 (Tenn. 2010). A court should grant a party's motion for summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 5 (Tenn. 2008); Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn. 1993). The movant bears the ultimate burden of persuading the court "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." Byrd, 847 S.W.2d at 215. If the motion for summary judgment is properly supported, then the burden shifts to the non-moving party to show that a genuine issue of material fact exists. Id. At the summary judgment phase, "it is not the role of a trial or appellate court to weigh the evidence or substitute its judgment for that of the trier of fact." Martin v. Norfolk S. Ry. Co., 271 S.W.3d 76, 87 (Tenn. 2008) (citing Byrd, 847 S.W.2d at 211).

The procedural status of this case is of particular relevance given the issue before us, because "[w]hether the plaintiff exercised reasonable care and diligence in discovering the injury or wrong is usually a question of fact." Shadrick, 963 S.W.2d at 737 (quoting Wyatt v. A-Best Co., 910 S.W.2d 851, 854 (Tenn. 1995)); see also McIntosh v. Blanton, 164 S.W.3d 584, 586 (Tenn. Ct. App. 2004) ("The determination of when a reasonable person should know that his injury was caused by some wrongful or negligent act is generally a question for the trier of fact."). Indeed, our Court of Appeals has stated that "where the

resolution of the issue depends upon the question of whether due diligence was exercised under the circumstances, and where differing inferences might reasonably be drawn from the uncontroverted facts, the issue is not appropriate for summary judgment." Hathaway v. Middle Tenn. Anesthesiology, P.C., 724 S.W.2d 355, 360 (Tenn. Ct. App. 1986). Similarly, courts in other jurisdictions have determined that the fact-dependent nature of the discovery rule's application makes it an unlikely candidate for disposition on summary judgment in both medical malpractice cases, see Walk v. Ring, 44 P.3d 990, 996 (Ariz. 2002) ("[S]ummary judgment is warranted only if the [plaintiff's] failure to go forward and investigate is not reasonably justified."), and other contexts, see Soutiere v. Betzdearborn, Inc., 189 F. Supp. 2d 183, 191 (D. Vt. 2002) (stating in toxic tort case that "[o]nly if reasonable minds cannot differ on the question of knowledge should the issue be determined as a matter of law"). Nevertheless, we may affirm the grant of summary judgment if the facts in the record and all reasonable inferences demonstrate that Ms. Sherrill's cause of action accrued on or prior to January 8, 2003.

As stated, Ms. Pigg testified by deposition that her mother executed a durable power of attorney on January 6, 2003, and that this event took place after Ms. Sherrill had been diagnosed with tardive dyskinesia. While this testimony suggests that Ms. Sherrill may have known about her condition as early as January 6, this knowledge alone does not trigger the accrual of her cause of action against the Defendants. Mere awareness of an injury does not necessarily include knowledge that the injury was caused by a breach of the standard of care by a particular defendant. Ms. Sherrill's awareness of her condition is, by itself, insufficient to have placed a reasonable person on inquiry notice regarding any wrongful actions by the Defendants. As such, the Court of Appeals erred by affirming the grant of summary judgment on grounds that Ms. Sherrill was aware of her condition on January 6, 2003.

The trial court determined "that Ms. Sherrill's cause of action accrued and the one year statute of limitations commenced to run" not on January 6, 2003, but rather on December 18, 2002, the date of her initial visit to the Ozarks Medical Center's Neurosciences Center. In support of their summary judgment motion, the Defendants point to the information that the medical professionals conveyed to Ms. Sherrill at that appointment. Dr. Applegate testified by deposition that both Ms. Sherrill and her daughter were present at the initial appointment. While Dr. Applegate was unable to recall her exact words on that day, she stated that she "would have told them that I thought [Ms. Sherrill] had a movement disorder that might have been triggered by the medication and that stopping the medication might take care of it." Dr. Applegate testified further that she "explained that any exposure to these medications can trigger such a disorder and that the side effects look like Parkinson's Disease in many cases and I felt that was what was wrong with her." The physician's notes of the December 18 visit corroborate Dr. Applegate's testimony. They indicate that she "shared with the patient that stopping this medication is important," and instructed her staff

to "contact[] the nursing agency to stop the [m]etoclopramide."

The Defendants have proffered uncontroverted evidence that Dr. Applegate and P.A. Lenihan informed Ms. Sherrill on December 18, 2002 that Reglan was the likely cause of her tardive dyskinesia. In our view, this information is sufficient to have placed a reasonable person on notice that the injury was the result of Dr. Souder's conduct, such that his wrongful action could have been discovered through reasonable care and diligence. Because the Defendants have established an affirmative defense,[10] the burden of production now shifts to Ms. Pigg to demonstrate a disputed issue of material fact regarding when the cause of the action accrued. See Hannan, 270 S.W.3d at 6 (citing Byrd, 847 S.W.2d at 215 n.5). In response to the motion for summary judgment, Ms. Pigg submitted an affidavit asserting: (1) that she was not present at the December 18, 2002 appointment, and (2) that neither Dr. Applegate nor her P.A. informed her that the long-term prescription of Reglan by Dr. Souder constituted a breach of the professional standard of care.

Ms. Pigg's second contention in her opposition to the summary judgment motion – that the cause of action did not accrue prior to January 8, 2003 because neither Dr. Applegate nor the P.A. informed her that the Reglan prescription constituted a breach of the professional standard of care – misstates the standard for our discovery rule. As an initial matter, because Ms. Pigg's individual claims were dismissed on January 8, 2007, and the trial court never acted upon her motion to be substituted as a plaintiff after her mother's death, Ms. Sherrill is the only plaintiff in this case at this time. In consequence, whatever the medical professionals told or failed to tell Ms. Pigg regarding her mother's tardive dyskinesia and the potential cause of that condition is not dispositive. Moreover, even assuming that Dr. Applegate and P.A. Lenihan never informed Ms. Sherrill that the long-term Reglan prescription constituted a breach of the professional standard of care, such an omission would not preclude a statute of limitations defense. As stated, a plaintiff need not actually know that the injury constitutes a breach of the appropriate legal standard in order for the limitations period to begin, Roe, 875 S.W.2d at 657, and advice from another health care professional that a cause of action exists is not a prerequisite to the accrual of that cause of action, Stanbury, 953 S.W.2d at 678.

Ms. Pigg's other claim – that she was not present at the December 18, 2002 appointment – is a fact in dispute. Dr. Applegate claimed that Ms. Pigg attended the appointment along with her mother, but the doctor's own records do not support that

---

[10] In Hannan, we discuss how we "misused the term 'affirmative defense'" in Byrd while attempting to "describ[e] a different, yet valid, method of burden shifting." 270 S.W.3d at 7. The Hannan/Byrd burden shifting analysis still applies, however, when, as here, the summary judgment motion relies upon a traditional affirmative defense set forth in Rule 8.03.

testimony. The physician's notes do not mention Ms. Pigg, while the notes from all of Ms. Sherrill's subsequent appointments, in contrast, document Ms. Pigg's presence. Further, Dr. Applegate, upon additional questioning, testified that Ms. Sherrill made her own notes at the appointment and that her daughter did not become involved until afterward. A factual dispute will not necessarily preclude summary judgment, however, unless the fact in question is material, i.e., one the court must decide in order to adjudicate the affirmative defense of the statute of limitations. Although the question of Ms. Pigg's presence at the December 18, 2002 appointment is disputed, it is not material to the determination of whether the cause of action accrued on that date. Even presuming the truth of her contention that she was not present on December 18, Ms. Pigg has failed to refute the Defendants' evidence that Ms. Sherrill was placed on notice of her cause of action that day. To the contrary, if Ms. Pigg was not present at the appointment, it stands to reason that she is unable to contradict Dr. Applegate's firsthand account of what she told Ms. Sherrill regarding her use of Reglan and the connection between the drug and tardive dyskinesia. Because Ms. Pigg has failed to establish a genuine issue of material fact regarding whether Ms. Sherrill was placed on inquiry notice of her medical malpractice claim during her first appointment with Dr. Applegate, we affirm the trial court's finding "that Ms. Sherrill's cause of action accrued and the one year statute of limitations commenced to run on December 18, 2002."

## II. The Tolling of the One-Year Limitations Period

Although we have determined that the trial court correctly held that, under our discovery rule, the limitations period began on December 18, 2002, our inquiry does not end there. Ms. Pigg argues in her brief that Dr. Applegate's instructions regarding the connection between the Reglan and the tardive dyskinesia at the December 2002 appointment "either were not clear or misunderstood by Ms. Sherrill, or she simply forgot them." The Defendants respond that "there are no facts in the record to support this contention." The trial court apparently agreed with this assertion, determining as a matter of law "that Ms. Sherrill was not suffering from any disability at the time the cause of action accrued which would justify a tolling of the statute of limitations."

## A. Applicable Law

The tolling statute for all civil actions, including medical malpractice actions, states as follows:

> If the person entitled to commence an action is, <u>at the time the cause of action accrued</u>, either under the age of eighteen (18) years, or <u>of unsound mind</u>, such person, or such person's representatives and privies, as the case may be, may commence the action, after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceeds three (3) years, and in that case within three (3) years from the removal of such disability.

Tenn. Code Ann. § 28-1-106 (2000) (emphasis added). In the medical malpractice context, this means that if the person who received treatment was of unsound mind at the time the cause of action accrued, the limitations period is tolled until the disability is removed. From the date of the removal of the disability, the person who received treatment (or the representative) has one year – the period of limitations for medical malpractice actions – in which to bring the suit.[11] Whether an individual was of unsound mind on the date the cause of action accrued, thus tolling the statute of limitations, is a question to be resolved by the trier of fact. Burk v. RHA/Sullivan, Inc., 220 S.W.3d 896, 904 (Tenn. Ct. App. 2006); see also Foster v. Allbright, 631 S.W.2d 147, 150 (Tenn. Ct. App. 1982); Smith v. Grumman-Olsen Corp., 913 F. Supp. 1077, 1086 (E.D. Tenn. 1995). If there is a genuine issue of material fact regarding whether Ms. Sherrill was of unsound mind on December 18, 2002, the date her cause of action accrued, the one-year limitations period is tolled, and her suit was timely filed.

Although the term "unsound mind," as it appears in section 28-1-106, has been left undefined by the General Assembly, our courts have considered the meaning of the term on several occasions. For example, in a case concerning the application of the unsound mind provision of the tolling statute to individuals allegedly suffering from post-traumatic stress from childhood sexual abuse, the Court of Appeals cited as authority an early case of this Court that interpreted the tolling statute's predecessor. Doe v. Coffee Cnty. Bd. of Educ., 852 S.W.2d 899, 905 (Tenn. Ct. App. 1992) (quoting Porter v. Porter, 22 Tenn. (3 Hum.) 586, 589 (1842)). The Court held in Porter that the statute of limitations on adverse possession of personal property had been tolled by the exception for persons non compos mentis[12] because Elizabeth Duffill, a ninety-year-old slave owner, was, due to "her extreme old age and mental imbecility, . . . incapable of attending to any business, or of taking care of herself, and had to break up keeping house and remove to the house of a relative to be taken care of by her friends." 22 Tenn. at 589 (emphasis added). The language from Porter and Doe has been cited repeatedly in medical malpractice cases by courts considering the term "unsound mind" as it appears in section 28-1-106. See Range v. Sowell, No. M2006-02009-COA-R3-CV, 2009 WL 3518176, at *6 (Tenn. Ct. App. Dec. 22, 2009); Burk, 220 S.W.3d at 904; Crawford v. Beatty, 108 S.W.3d 877, 880 (Tenn. Ct. App. 2003).

_____

[11] While the period of limitations for the filing of a medical malpractice action under Tennessee Code Annotated section 29-26-116(a)(1) & (2) may be tolled pursuant to the "unsound mind" exception in section 28-1-106, the three-year period of repose set forth in section 29-26-116(a)(3) cannot be tolled for mental incompetency. Mills v. Wong, 155 S.W.3d 916, 920-21 (Tenn. 2005) (citing Penley v. Honda Motor Co., 31 S.W.3d 181, 186-89 (Tenn. 2000)). Given the timing of the filing of the lawsuit in this case, the statute of repose is not implicated.

[12] Literally, "not master of one's mind." Black's Law Dictionary 1151 (9th ed. 2009).

Setting aside Porter's archaic and obviously distinguishable facts, the Porter standard is still relevant to determining whether the limitations period for a cause of action is subject to tolling. This Court held in Porter that because of her age and infirmity, Ms. Duffill fell within the constructs of the tolling statute, a predecessor to Tennessee Code Annotated section 28-1-106. Our interpretation of the holding is that Ms. Duffill, because of her inability to attend to her business or take care of herself, was among those entitled to the benefit of the tolling statute. The Court did not, however, as some subsequent cases have suggested,[13] establish a baseline requirement for all individuals seeking the protections of the statute. The physical infirmity component, which the Porter language ostensibly requires, has little bearing on whether an individual understands his or her legal rights and responsibilities at the time a cause of action accrues. Cf. In re Conservatorship of Groves, 109 S.W.3d 317, 334-36 (Tenn. Ct. App. 2003) (differentiating between "functional capacity" and "decision-making capacity" with regard to the standard for granting a conservatorship petition).

While the language from Porter still serves as a guide in the determination of whether an individual is of unsound mind,[14] the modern test for determining whether an individual is of "unsound mind" for purposes of section 28-1-106 is whether that individual was unable to manage his or her day-to-day affairs at the time the cause of action accrued. This standard comports more fully with the test used in other jurisdictions at this time. 54 C.J.S. Limitations of Actions § 172 (2010) ("The general test that is applied in determining whether a mental condition is of the type that will toll a statute of limitations, is whether a person could know or understand his or her legal rights sufficiently well to manage his or her personal affairs . . . ."); see, e.g., Doe v. Roe, 955 P.2d 951, 964 (Ariz. 1998); Sheats v. Tri-Cities Hosp. Auth., 306 S.E.2d 75, 76 (Ga. Ct. App. 1983); Roe v. Gelineau, 794 A.2d 476,

---

[13] See, e.g., Crawford, 108 S.W.3d at 880 ("Our courts have held that the term 'unsound mind' in Tenn. Code Ann. § 28-1-106 means the person relying on this exception must show that she was 'incapable of attending to any business, or of taking care of herself.'"); Grumman-Olsen Corp., 913 F. Supp. at 1085 (stating that the unsound mind standard in Tennessee "has two components; one, is the person alleged to be of unsound mind incapable of attending to *any* business, or two, is the person . . . incapable of taking care of himself or herself"); see also Jacobs v. Baylor Sch., 957 F. Supp. 1002, 1010 (E.D. Tenn. 1996) (same).

[14] Indeed, this Court cited language from Porter approvingly in State v. Nix, 40 S.W.3d 459, 463 (Tenn. 2001). We note that the Court was not called upon in Nix to construe Tennessee Code Annotated section 28-1-106. It did not, in fact, even cite the tolling statute. Rather, it merely looked to the standard for competency in civil actions for assistance in determining when due process requires tolling of the one-year limitations period for filing a post-conviction petition in Tennessee. The standard it ultimately settled upon in such cases – that the petitioner must show "that he is unable either to manage his personal affairs or to understand his legal rights and liabilities" – is consistent with the standard we adopt in this opinion. See id. at 463.

486 (R.I. 2002). In our efforts to clarify the meaning of "unsound mind," we are persuaded by the extensive analysis of the Supreme Court of Rhode Island, which traced the history of its tolling statute and ultimately concluded as follows:

> [T]he legal history of the term "unsound mind" makes clear that the designation is intended to apply to the incapacity to carry out legal functions
> . . . .
>
> In our opinion, "the inability to manage one's day-to-day affairs" provides a practical, operational definition of unsound mind. This definition accords with the historical attributes of legal disability and comports with the traditional use of the term as a form of legal incapacity . . . . At the same time, this definition of unsound mind can be applied readily by trial justices and fact-finders and refines the term by requiring objectively ascertainable actions or inaction. . . . We believe that defining unsoundness of mind in terms of the concrete, objective standard of inability to manage one's day-to-day affairs complies with the statutory intent of the term . . . .

Roe, 794 A.2d at 486-87 (citations omitted). The focus of the inquiry under section 28-1-106 should be on a plaintiff's mental capacity to understand his or her legal rights and responsibilities, including the cause of action that has accrued.

### B. Application of the Law

The determinative question, as stated, is whether there is a genuine issue of material fact regarding Ms. Sherrill's ability to manage her day-to-day affairs on December 18, 2002, when otherwise her cause of action accrued. Because we must assess Ms. Sherrill's competence without the benefit of her testimony, our task is more difficult. Moreover, because Ms. Pigg claims that she was not present at Ms. Sherrill's initial neurologist appointment on December 18, 2002, her testimony with regard to her mother's ability to understand her legal rights and liabilities on that date is not particularly helpful. Considering the evidence in the light most favorable to the non-moving party, however, we conclude that the grant of summary judgment in favor of the Defendants was erroneous.

The Defendants argue that on December 18, 2002, Ms. Sherrill did not suffer from a disability that would toll the statute of limitations. As support for the argument, the Defendants point to Dr. Applegate's description of Ms. Sherrill as "a pretty sharp individual [with] a good sense of humor." Further, according to Dr. Applegate, Ms. Sherrill took her own notes at the December 18 appointment and had "clear speech and full comprehension" at the January 16, 2003 appointment. Ms. Pigg acknowledged that she had not really noticed changes in her mother's mental status by January 16, 2003. Other evidence supports the

Defendants' claims that Ms. Sherrill lived alone both prior to and for an extended period after the December 18 appointment and took her own medications. Although her in-home care increased during 2003 and 2004, Ms. Pigg described her mother's mental status as "fair" as late as June of 2004.

In contrast, Dr. Applegate diagnosed Ms. Sherrill with "early senile dementia of Alzheimer's type" on December 18, 2002. Further, Dr. Applegate testified that she had the impression that Ms. Sherrill was suffering from Alzheimer's disease and "that she was having problems with her memory [which] was starting to fail." Dr. Applegate described Ms. Sherrill as "demented," an observation corroborated by P.A. Lenihan's statement to Ms. Pigg that her mother had a form of dementia. The physician's notes of the January 16 appointment indicate that a test administered to determine Ms. Sherrill's mental status resulted in "a total score of 21/30, which is moderate to severe Alzheimer's." Moreover, although Ms. Sherrill was informed on December 18, 2002 that her tardive dyskinesia condition was caused by Reglan, a medication she had been taking for several months, she did not stop taking the drug after the December 18 appointment. That she continued to ingest Reglan until the follow-up appointment on January 16, 2003 is of significance. Ms. Sherrill's continued use of Reglan despite clear warnings that the drug was the cause of her neurological condition suggests an inability to manage her day-to-day affairs during this period.[15]

During the summary judgment stage of a proceeding, all reasonable inferences must be resolved in favor of the non-moving party. In our view, a trier of fact could legitimately resolve the question of competence in favor of Ms. Sherrill. Because disputed issues of material fact exist regarding whether Ms. Sherrill was of unsound mind on the date the cause of action accrued, the grant of summary judgment in favor of the Defendants was error.[16] Whether the one-year limitations period for medical malpractice actions should be tolled due

---

[15] Although Ms. Sherrill executed a durable power of attorney in her daughter's name on January 6, 2003, we recently held "that the granting of a durable power of attorney does not remove a disability for the purpose of" section 28-1-106. Sullivan ex rel. Wrongful Death Beneficiaries of Sullivan v. Chattanooga Med. Investors, LP, 221 S.W.3d 506, 513 (Tenn. 2007). As such, the fact that Ms. Sherrill exercised the power of attorney on January 6 does not constitute a removal of her disability that would have caused the limitations period to expire before the date the lawsuit was filed. See Tenn. Code Ann. § 28-1-106.

[16] The Defendants argue that Ms. Pigg is precluded from raising the issue of her mother's mental competency on appeal because she failed to do so in the trial court. Ms. Pigg's response in opposition to the Defendants' motion for summary judgment, however, states that her absence from her mother's initial appointment with Dr. Applegate was significant "in light of Ms. Sherrill's memory loss." Moreover, there is ample evidence in the record from which a trier of fact could determine that Ms. Sherrill was of unsound mind on the date her cause of action accrued. We, therefore, decline the Defendants' invitation to hold that the issue is waived.

to a lack of mental competence is a question of fact. Because Ms. Sherrill has sought the application of the tolling statute to a suit otherwise untimely filed, she, or her representative, bears the burden of proving at trial that she was of unsound mind at the time the cause of action accrued. See Jacobs, 957 F. Supp. at 1010.

### Conclusion

The discovery rule is an objective standard. Because the information provided to Ms. Sherrill on December 18, 2002, was sufficient to place a reasonable person on notice that her tardive dyskinesia condition was the result of the Defendants' wrongful conduct, Ms. Sherrill's complaint filed on January 8, 2004, was untimely. Because, however, there is a genuine issue of material fact regarding whether the one-year limitations period should be tolled because of Ms. Sherrill's inability to manage her day-to-day affairs on the date the cause of action accrued, the judgment of the Court of Appeals affirming the dismissal of the suit is reversed. The cause is remanded for the trial court to consider Ms. Pigg's motion to amend the complaint by her substitution as plaintiff, and for a trier of fact to determine whether Ms. Sherrill was of unsound mind on December 18, 2002. The costs of this appeal are taxed to the Defendants, Bob T. Souder, M.D. and TransSouth Healthcare Center, P.C., for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE