NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0683n.06

**No. 14-5090**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | | **FILED**<br>Sep 03, 2014<br>DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| JEANE L. SMITH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE AT |
| J.J.B. HILLIARD, | ) | KNOXVILLE |
| W.L. LYONS, LLC, | ) | |
| | ) | **O P I N I O N** |
| Defendant-Appellee. | ) | |

_____

**Before: GIBBONS and McKEAGUE, Circuit Judges; LAWSON,[*] District Judge.**

**DAVID M. LAWSON, District Judge.** Plaintiff Jeane L. Smith, in her capacity as the co-trustee of testamentary trusts set up by her deceased aunt, filed a lawsuit in March 2011 against J.J.B. Hilliard, W.L. Lyons, LLC, her investment counselor and broker dealer, alleging that its agent, David Stanley Shelton, made incompetent investment decisions ten years earlier that cost the trusts over half their value. The district court granted summary judgment to the defendant on its statute of limitations defense. Smith argues on appeal that the district court misapplied Tennessee's "discovery rule" and that the limitations period was tolled by Shelton's and Hilliard's alleged fraudulent concealment of the true reasons that the trusts suffered such heavy losses. We disagree and affirm the district court's judgment.

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

The last will and testament of Ms. Ula Doughty created three testamentary trusts, the life beneficiaries of which were her relatives and, thereafter, the University of Tennessee at Knoxville. Jeane L. Smith, Doughty's niece, is the beneficiary of one of the trusts, a co-trustee for all three, and after the stipulated dismissal of the other named plaintiffs, now is the sole remaining plaintiff and appellant. Smith had been employed as a bookkeeper for several decades before Doughty's death, and she met regularly with Doughty to review her investments. Doughty stipulated in her will that each of the three trusts would be funded with $1,000,000 of municipal bonds allocated from the assets held in her personal investment account at the time of her death.

In addition to naming Smith as a trustee, Doughty's will also named David Stanley Shelton as a co-trustee and "investment counselor" for each of the trusts. Shelton worked as a financial consultant in the Knoxville office of defendant J.J.B. Hilliard, W.L. Lyons, LLC, a securities broker dealer, from February 1991 until August 2005. The will directed that for each trust, "the Co-Trustees shall follow the written directions of the investment counselor with respect to the purchase, sale . . . or encumbrance of trust principal and the investment and reinvestment of funds held hereunder and shall have no duty to review or monitor trust investments." Shelton contends that he did not make any investment decisions himself as co-trustee of the trusts, but made only "recommendations" regarding the investment of trust assets, which were approved by Smith. Smith does not dispute that she "agreed to the investments" that Shelton recommended for the trust.

Shelton handled Doughty's investment account from 1994 or 1995 until her death in the spring of 2000. Before Ms. Doughty's death, the investments in her account included a "Declaration Annuity" and a "Triple Advantage Annuity," both of which had been acquired using margin debt (money lent to her account by Hilliard Lyons, on which the account paid substantial interest). The two annuities were purchased some time in 1998.

After Doughty died, the assets in her investment account were transferred to an estate account, which held the assets bequeathed to the several trusts created under Doughty's will. In April 2000, the assets held in the estate account included $2,864,000 in municipal (tax exempt) bonds, along with the Declaration and Triple Advantage annuities, each of which had an original contract value or acquisition cost of $1,000,000. The account statement from April 2000 does not disclose the market value of the Declaration and Triple Advantage annuities when they were transferred into the estate account, but it does reflect that at that time the account had a margin balance (outstanding debt owed to Hilliard Lyons) of $1,478,000. The record is unclear on this point, but the figures suggest that the account had a net asset value between $1,386,000 and $3,386,000, depending on the market value of the two original annuities.

The sole stated investment objective for the estate account was "tax free income," which was consistent with the desire expressed in Doughty's will that the "Trustee maintain all investments of the Trust assets in tax-free municipal bonds so that [the beneficiaries] will receive tax-free income from the Trust." However, the co-trustees retained discretion to invest the assets in any equity or debt security they chose.

The investments that caused the dispute in this case occurred in May and August 2000. On May 25, 2000, on Shelton's recommendation, Smith authorized the purchase of a "Pacific Value Variable Annuity" by the estate account, for the benefit of the Ula Love Doughty Charitable Remainder Trust of which she was a beneficiary. On August 28, 2000, Smith authorized the purchase of a second "American Express Annuity" by the trust account, also on Shelton's recommendation. The cost of each of the two annuities was $1,000,000. Shelton testified that he could not remember the details of the transactions, but he recalled that the purchase was not funded by the sale of any of the estate's municipal bonds, and after reviewing the monthly estate account statements for April and May 2000, he conceded that the Pacific Value annuity must have been purchased using margin debt. Shelton also confirmed that in May 2000, the account showed a balance of $1,200,000 in margin debt. Hilliard Lyons contends that the account statements for the months of June, September, and October 2000, following the purchase of the two annuities, reflect that in those months the estate account had either no outstanding margin debt or at most less than $500. Nevertheless, Shelton testified that when the Pacific Value and American Express annuities were purchased by the estate account, he knew that the estate owed $166,779 in state taxes and $620,779 in federal taxes that had not been paid. The monthly statement for December 2000 reflected that checks for the taxes were issued from the account to satisfy the tax liabilities, and for that same month the statements revealed that the account had a balance of $820,000 in margin debt.

Moreover, both the Pacific Value and the American Express annuities allocated all of their assets to equity instruments. This was no secret, as the allocations were clearly set out in the

respective applications. The applications were equally clear that none of the funds' assets would be invested in debt instruments, including municipal bonds.

When asked to consider the disposition of the estate account as of April 2000, Shelton conceded that the interest paid on the margin debt would have consumed some of the tax exempt income produced by the municipal bonds, and the investment of significant assets in the two stock-holding annuities was "probably not" consistent with the stated investment objective of tax free income.

For her part, Smith admits that as executor and trustee for the estate account, she received monthly statements for the estate account from Hilliard Lyons from April 2000 through November 2005, and quarterly statements from each of the annuities purchased by the account for the same period. Smith testified that she never reviewed the statements, but simply filed them away. However, Smith understood that Shelton was the co-trustee and financial advisor for the estate account, and if she had any concerns about anything that appeared in the account statements she could contact him to ask him questions. But she never contacted Shelton to tell him that anything on the statements seemed "out of the ordinary" or that any of the investments reflected in the statements were contrary to her directions as trustee.

In February 2001, Hilliard Lyons directed Shelton to resign as trustee from all accounts for which he was serving in that capacity. Shelton explained that serving as both a trustee and an investment advisor or agent for a trust presented a conflict of interest and violated Hilliard Lyons policy. Shelton did not recall if he notified the other trustees of his various accounts that he had

resigned, but he asserts that he did resign and that he no longer would have been listed as a trustee or co-owner on any account records after February 2001.

Less than eighteen months after they were purchased, the collective value of the two annuities had declined by more than fifty percent from their nominal total purchase cost of $2,000,000 to $952,532.87. By the end of 2002, the value of the Pacific Value annuity had fallen to $485,540.74, and the American Express annuity had fallen to $466,992.13.

On June 9, 2005, Shelton's supervisor at Hilliard Lyons, Brian Donaldson, sent Shelton an email regarding a "margin notice," which as Shelton explained related to a "margin call," or a situation where "the value of the securities and the value of the margin debt don't meet the requirements and you have to put more money into the account so that it meets the guidelines." Donaldson wrote: "Stan, Why would an estate account with munis and an annuity be on margin anyway? More to the point, let me know how the client will handle the [margin] call."

After Shelton left his position at Hilliard Lyons in August 2005, the estate account and all of its assets were transferred from Hilliard Lyons to Shelton's new employer, and Hilliard Lyons no longer held any assets or had any responsibility for the management of the trusts or the estate account.

Smith did not file her state court complaint in this case until March 2, 2011. The complaint alleges that Hilliard Lyons is liable for the misconduct of Shelton as its agent and is liable for failing to disclose to Smith material facts regarding the conflict of interest in Shelton's position as both trustee and investment counselor, as well as the fact that the investments recommended by Shelton

were incompatible with the stated investment objective of the estate account. Smith explained the delay in bringing suit by alleging that until approximately 60 days before filing the complaint, she had no knowledge of the facts that (1) the assets in Doughty's account at the time of her death were not enough to fund all three trusts with $1,000,000 each; (2) the purchases of the Pacific Value and American Express annuities were funded by margin debt; and (3) Shelton had resigned as trustee of the trusts at Hilliard Lyons' direction due to a conflict of interest. Smith contends that "before the recent disclosures by Mr. Shelton, plaintiffs had only a limited understanding that the trusts had sustained some investment losses and did not know they were the result of any legal misconduct." She alleges that Shelton "told plaintiffs that these losses were simply the result of the general market downturn," and that he "also stated, untruthfully, that the annuities' death benefits would ultimately replenish the trusts." During her deposition, Smith testified that she was not aware of any facts that would support the specific allegations in paragraphs 18 through 25 of the complaint, which alleged the details of the misconduct summarized above; that she could not recall if Shelton made any of the alleged statements to her regarding the management of the account, or if he did, when he had made them; and that she could not recall when was the last time that she spoke to Shelton.

Hilliard removed the case to federal court, and, after a period of discovery, moved for summary judgment on its statute of limitations defense. The district court granted the motion and dismissed the case. The parties agreed that Tennessee's three-year statute of limitations governed the claims for breach of fiduciary duty, negligence, and recklessness, and a three-year statute of repose governed the Tennessee Securities Act claim. There was also no dispute that the plaintiff did

7

not file her lawsuit for more than ten years after the challenged investments were purchased, over nine years after they incurred the precipitous losses cited by the plaintiff, and over five years after Shelton left the defendant's employ, all of which conceivably could have represented the accrual date for the plaintiff's claims. The court noted that Smith had signed both investment applications and received regular statements over several years from the broker and the annuities, so she knew or should have known that the investments had been made and caused heavy losses to the trusts. Therefore, the court reasoned, the plaintiff had all the information necessary to discover the injury and its source in the defendant's wrongful conduct, and no reasonable juror could conclude otherwise. The district court also found that the limitations period was not tolled by any failure by the defendant to disclose information that prevented the plaintiff from learning of the investment losses and any potential claims she might have had against Hilliard Lyons based on those losses.

Smith filed a timely appeal.

## II.

Both sides assert in their jurisdictional statements that this Court has subject matter jurisdiction over an appeal from the district court's final judgment, which in turn was based on diversity jurisdiction over the removed case. Neither side expressed dissatisfaction with those representations, and subject matter jurisdiction was not discussed by the district court. But there is a problem.

At the time the case was removed, there were several named plaintiffs, all of whom were beneficiaries of the three testamentary trusts. The complaint alleged that some were citizens of

Georgia, Tennessee, and California. The complaint also alleged, incorrectly, that defendant-appellee

J.J.B. Hilliard, W. L. Lyons, LLC, a limited liability company, "is an out-of-state corporation with

an office in Knox County Tennessee." The defendant admitted the allegations of paragraph 5 in its

answer, but did not elaborate on the citizenship or membership of J.J.B. Hilliard or its parent HL

Financial. When determining diversity of citizenship, a limited liability company has the citizenship

of each of its members. *Delay v. Rosenthal Collins Group, LLC*, 585 F.3d 1003, 1005 (6th Cir.

2009).

During the course of the lawsuit, the parties agreed to dismiss all of the plaintiffs except

Jeane L. Smith, the co-trustee of all three trusts. That is how the case comes to us on appeal. Smith

is a citizen of Georgia.

After directions from this court, the parties submitted letter briefs addressing the issue of

complete diversity. In its brief, defendant-appellee Hilliard Lyons states:

> The members of Hilliard Lyons are (1) Houchens Industries, Inc., a Kentucky corporation with its principal place of business located in Bowling Green, Kentucky, and (2) HL Financial Services, LLC, a Kentucky limited liability company with its principal office located in Louisville, Kentucky. There are 196 members of HL Financial Services, LLC, all of whom reside in the following states: Kentucky, Indiana, Ohio, *Tennessee*, Florida, Arkansas, South Carolina, Michigan, Pennsylvania, Illinois, West Virginia, and North Carolina. HL Financial Services, LLC has no members who reside in the State of Georgia.

(Emphasis added.) Hilliard Lyons contends that because no member or sub-member of Hilliard

Lyons is a resident of Georgia (the state of which Jeanne Smith, the sole remaining plaintiff, is a

citizen), complete diversity exists and this court has subject matter jurisdiction. The plaintiff

concurred with that position without elaboration.

9

However, the complaint alleged that plaintiff "Scott O. Lanford is a resident of Oltewah, Tennessee." "In order for a defendant to remove a case to federal court based upon diversity jurisdiction, there must be complete diversity of citizenship both at the time that the case is commenced and at the time that the notice of removal is filed," and where "complete diversity did not exist when the case was removed . . ., the district court lacked subject matter jurisdiction." *Jerome-Duncan, Inc. v. Auto-By-Tel, LLC*, 176 F.3d 904, 907 (6th Cir. 1999) (citing *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 908 (6th Cir. 1993)). It therefore appears that the district court did not have subject matter jurisdiction at the time of removal because Tennessee citizens were among both the plaintiffs and the defendant.

Nevertheless, this court has held that "where removal is improper but a final judgment issues with jurisdiction existing at that time . . . if the plaintiff did not move to remand to state court, the judgment stands." *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 327 (6th Cir. 2007). Moreover, "'an erroneous removal need not cause the destruction of a final judgment, if the requirements of federal subject-matter jurisdiction are met at the time the judgment is entered.'" *Ibid.* (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73 (1996)).

Hilliard Lyons did not address whether complete diversity existed at the time of removal, but it does point out that 28 U.S.C. § 1441(b)(2) prohibits removal by a resident defendant, which Hilliard Lyons was by virtue of having a Tennessee citizen as a sub-member. Hilliard Lyons contends that any concerns on this point ought to be allayed because the plaintiff waived its right to object to removal by failing to file any motion to remand. That may be true of non-jurisdictional

defects in removal. *See Southwell v. Summit View of Farragut, LLC*, 494 F. App'x 508, 511 n.2 (6th Cir. 2012) ("we have held that § 1441(b)(2) is non-jurisdictional and must be raised by the plaintiff in a motion to remand") (citing *Plastic Moldings Corp. v. Park Sherman Co.*, 606 F.2d 117, 119 n.1 (6th Cir. 1979); *RFF Family Partnership, LP v. Wasserman*, 316 F. App'x 410, 411-12 (6th Cir. 2009)). But the failure of complete diversity is not a non-jurisdictional defect. *See Delay*, 585 F.3d at 1005.

In any event, even if the removal was not authorized by the statute, the general rule still would apply that "where after removal a case is tried on the merits without objection and the federal court enters judgment, the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 702 (1972). Taken together with the holdings of *Caterpillar* and *Gentek*, *Grubbs* stands for the general principle that regardless of whether removal was improperly taken at the outset of the matter, and even where the district court lacked subject matter jurisdiction at the time of removal, a final judgment later rendered may stand as long as the trial court in fact had subject matter jurisdiction at the time the judgment was entered. We conclude that complete diversity existed at the time the district court entered its judgment because the plaintiff was a citizen of Georgia and no member of the defendant LLC was a citizen of that state.

III.

This Court "review[s] de novo [a] district court's grant of summary judgment." *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009) (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 374 (6th Cir. 2007)). "Summary judgment 'should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Ibid.* (quoting Fed. R. Civ. P. 56(c)). "The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law." *Ibid.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

"When sitting in diversity, federal courts are required to apply the substantive law of the states in which they reside," *In re Darvocet, Darvon, & Propoxyphene Products Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that a federal court sitting in diversity is bound to follow the law of the forum state)), and we are "bound by the rulings of the state supreme court" on questions of state law, *ibid.* (citing *Bradley v. Gen. Motors Corp.*, 512 F.2d 602, 604-05 (6th Cir. 1975)). "Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) (per curiam) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)). Just as limitations periods are taken from state law, so are the rules regarding tolling. *Wallace v. Kato*, 549 U.S. 384, 394 (2007) ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitation.").

A.

Smith's main argument on appeal is that Hilliard failed to carry its burden of establishing the lack of a material fact issue, because it did not *dis*prove that Smith discovered her claims within the limitations period. However, that argument misconstrues the allocation of burdens on the limitations issue under Tennessee law. The Tennessee Supreme Court has held that once a defendant sets forth a *prima facie* limitations defense — i.e., where the undisputed facts show that the claim was complete outside of the limitations period — then the burden is on the plaintiff to establish that either the discovery rule or a recognized tolling exception should apply in order to defeat that defense. *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463-64, 467 (Tenn. 2012). As we recently explained, "[b]ecause the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run, and if the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)) (quotation marks and alterations omitted).

A statute of limitations defense has three components: "the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing*, 363 S.W.3d at 456. The parties agree that the plaintiff's claims (negligence, recklessness, and breach of fiduciary duty) sound in tort, for which the statute of limitations is three years. *See* Tenn. Code Ann. § 28-3-105. A cause of action accrues when the plaintiff discovers it, that is, "when the

plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *PNC Multifamily Capital Inst'l Fund XXVI v. Bluff City Comty. Dev. Corp.*, 387 S.W.3d 525, 544 (Tenn. Ct. App. 2012) (citing *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997)); *see also Pier v. Jungkind*, 427 S.W.3d 922, 927 (Tenn. Ct. App. 2013) (stating that "[t]he discovery rule determines when a cause of action accrues" (citing *PNC Multifamily*, 387 S.W.3d at 544)).

Several Tennessee state court decisions have elaborated on the idea that the statute of limitations does not begin to run merely with the discovery of the injury; also required is "the discovery of the source of the injury." *Redwing*, 363 S.W.3d at 458 (citing *Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010) (the cause of action accrues when the plaintiff discovers both the injury and the "identity of the person or persons whose wrongful conduct caused the injury"); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (the cause of action accrues when the plaintiff knows or should know that she sustained an injury "as a result of wrongful . . . conduct by the defendant"); *Wyatt v. A–Best, Co.*, 910 S.W.2d 851, 855 (Tenn. 1995) ("a prerequisite to the running of the statute of limitations is [the] plaintiff's reasonable knowledge of the injury, its cause and origin"); *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982) ("no judicial remedy [is] available to [a] plaintiff until he [or she] discover[s], or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his [or her] injury; and (2) the identity of the defendant who breached the duty")).

However, "the discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages," *Redwing*, 363 S.W.3d at 459 (citing *B&B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010); *Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996)), "or until the plaintiff knows the specific type of legal claim it has," *ibid.* (citing *John Kohl & Co.*, 977 S.W.2d at 533; *Stanbury*, 953 S.W.2d at 677; *Wyatt*, 910 S.W.2d at 855). "The discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim." *Ibid.* (citing *Mills v. Booth*, 344 S.W.3d 922, 929 (Tenn. Ct. App. 2010)).

And the Tennessee courts have clearly explained that the statute can begin to run before a plaintiff has actual knowledge of her legal claim, if she has learned of "'facts sufficient to put a reasonable person on notice that [s]he has suffered an injury as a result of wrongful conduct.'" *Redwing*, 363 S.W.3d at 459 (quoting *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995)). "[I]nquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed." *Ibid.* (quoting *Sherrill*, 325 S.W.3d at 593 n.7) (internal quotation marks omitted). "[O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate 'the injury,' the limitation period begins to run." *Ibid.*

In the mine run of such cases, what a plaintiff knew and when she came to know it is a fact question "inappropriate for summary judgment." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citing *Prescott v. Adams*, 627 S.W.2d 134, 139 (Tenn. Ct. App. 1981)). But like all fact questions, if the record demonstrates "that there is no genuine dispute

15

as to [a] material fact[, the defendant asserting the statute of limitations defense] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A plaintiff opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the plaintiff, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, the undisputed facts plainly establish a *prima facie* defense that Smith's claims are time barred. The large investment losses incurred by the trusts mostly occurred between April 2000 and December 2002. Smith lays the cause of those losses — investing trust assets in "high growth" stock based annuities, and aggravating the losses by the use of margin debt to fund the annuity purchases — at the feet of Shelton and his recommendations. If we accept in full Smith's theory as to the cause for the losses, any breach of duty or negligence by Hilliard Lyons must have occurred at the earliest around April 2000, when the estate account was first opened and the assets from Doughty's personal investment account were transferred, and at the latest in November 2005, after Shelton's employment with Hilliard ended. By any measure, the complaint filed in 2011 was beyond the three-year period of limitations. "Because the [defendant] has made out a prima facie statute of limitations defense, the burden is on [the plaintiff] to demonstrate that [her] claims against the [defendant] should not be time-barred." *Redwing*, 363 S.W.3d at 467.

Smith cites a number of district court cases for the proposition that the "unrebutted" allegations in the complaint that support her discovery and tolling claims must be assumed to be true

at the summary judgment stage. But she must back up those allegations with evidence. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (noting that "the party opposing [a motion for summary judgment] may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion" (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). The record evidence, however, actually contradicts the allegations in the complaint.

Smith's testimony and the undisputed documentary evidence in the record positively establish that Smith knew or should have known by December 2000, and certainly by November 2005, each of the crucial facts that she relies on to support her claims. That information should have prompted her to make a reasonable inquiry into the facts. Had Smith done so, she would have discovered both the injury and the identity of the persons responsible for it more than three years prior to the date that she filed her complaint. No jury reasonably could conclude otherwise.

*First*, Smith alleges that she was not aware of the use of margin debt to purchase the Pacific Value and American Express annuities. But she does not dispute that the April, May, and December 2000 monthly statements from Hilliard Lyons disclosed that the estate account had a margin debt balance for each of those periods between $800,000 and $1,200,000 dollars. *Second*, Smith says that she was not aware that Shelton had assumed a conflict of interest by serving as both co-trustee and investment counselor for the trusts. But she does not dispute that she received account statements and signed purchase authorizations that plainly identified Shelton in his dual roles. *Third*, Smith maintains that she did not understand that the estate account had suffered significant losses as a

result of the improper investments, but she does not dispute that she received monthly and quarterly statements from April 2000 through November 2005 that reflected the more than 50% decline in the value of the trust's investments in the two annuities. The complaint alleges that Shelton told Smith those losses were due to a general market downturn and that the death benefits of the annuities eventually would replenish the trust assets, but she has not offered any record evidence to sustain those allegations. And although Smith contends that she had no knowledge of the wrongful cause of the trusts' losses, she does not dispute that information about the allocation of investments and the amount of the losses was readily available to her, had she taken the time to review the documents.

That information placed Smith on inquiry notice. Her response — that she never questioned Shelton or examined the multitude of statements — is no excuse. "[M]ere ignorance of a possible cause of action does not toll the statute," *In re Estate of Davis*, 308 S.W.3d 832, 842 (Tenn. 2010), and Smith cannot overcome Hilliard's *prima facie* limitations defense by pleading that she did not know of her injuries or did not understand the causes of them, simply because she failed to take notice of the facts that lay before her.

Smith relies on *Foster v. Harris*, 633 S.W.2d 304 (Tenn. 1982), arguing that even if the fact of the injury in the form of losses to the trust assets was apparent, the "occasion, the manner and means by which a breach of duty occurred that produced" those losses were not. *Id.* at 305. But in *Foster*, the plaintiff did not learn — and reasonably could not have learned — the underlying, essential facts that led him to the wrongful cause of his injury until more than six months after the

18

injury itself became apparent. Foster was diagnosed with hepatitis in January 1976, but did not learn the source until his dentist admitted in July 1976 that the dentist had hepatitis and had cut himself and the plaintiff while performing an oral surgery in October 1975, causing their blood to mingle. The court held that the medical malpractice claim accrued when the dentist made the crucial admissions in July 1976, not earlier in January 1976, when the disease was first diagnosed.

*Foster* does not help Smith, who knew or should have known all of the essential predicate facts showing damages and the attribution of her injury at the latest by November 2005.

Smith also maintains that the information that had been presented to her must be considered in light of her financial literacy. She cites a study that concludes that elderly people and women are less knowledgeable about investments than "the average population." How that factors into the discovery rule calculus has not been made clear, and Smith cites no authority to support that argument. What is clear from the undisputed record, however, is that all the information that Smith relies upon in her complaint was available to her in 2005 or earlier. She apparently did not appreciate the significance of it until she sought the advice that led to this lawsuit. But the concept of inquiry notice includes the obligation to ask those questions when a person suffers an injury at the hands of another. *Redwing*, 363 S.W.3d at 459. The discovery rule does not shield a claimant from her delayed "investigat[ion of] 'the injury'" *Ibid.*

The district court correctly found that Smith filed her complaint well after the three-year statute of limitations expired.

B.

Smith also contends that the statute of limitations was tolled by the defendant's silent fraud. Tennessee courts have long held that "fraudulent concealment will toll the running of a statute of limitations." *Redwing*, 363 S.W.3d at 460-61 (citations omitted). "As it currently exists in Tennessee, the doctrine of fraudulent concealment is aligned with the discovery rule." *Id.* at 462. In fact, they are two sides of the same coin. But it is the plaintiff that must shoulder the burden of proving (1) affirmative concealment of the injury or wrongdoer (which may be established by showing that the defendant was silent in the face of a duty to speak); (2) the plaintiff could not discover that information with reasonable diligence; (3) the defendant knew of the injury and the identity of the wrongdoer; and (4) the defendant withheld the information used "some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry." *Id.* at 462-63.

The district court found that Smith's tolling argument failed because she could not show, as she must, that she "exercised reasonable care and diligence in pursuing [her] claim." *Redwing*, 363 S.W.3d at 463 (citing *Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977); *Ray v. Scheibert*, 450 S.W.2d 578, 580-81 (1969)). We agree. The same evidence that Smith now advances to substantiate her claim that Hilliard Lyons breached its fiduciary duty by not telling her why the trust incurred heavy losses also establishes that if she had undertaken a reasonably diligent investigation of the information disclosed to her in the monthly and quarterly statements and in other account documents — as her expert witness evidently did long after the fact, in October 2013 — then she

20

would have discovered her claims against Hilliard Lyons long before November 2005, when the estate account was transferred out of Hilliard Lyons's custody.

Smith's arguments based on allegations of positive misrepresentations — that the losses were the result of a general market downturn, and that the annuity death benefits eventually would repair the losses — are not supported by the record. She has not offered any evidence that those misrepresentations ever were made, and she testified that she did not know any facts that could support any of the related allegations in the complaint. Smith alleged that mismanagement occurred when Shelton committed trust assets to investment vehicles that were exposed to the risk of a volatile stock market, in a way that the allegedly more suitable municipal bonds would not have been. As Smith's expert concluded in his report: "In light of the Doughty Trusts' highly leveraged exposure to equities in the annuity portfolios, it was foreseeable that the market value of the Trusts would be correlated to the volatility and performance of the equity markets. And that is exactly what occurred." In light of the trust's stated investment objective, a reasonable trustee would have taken Shelton's admission of substantial losses as an urgent prompting to conduct a diligent investigation into Shelton's and Hilliard Lyons's handling of the trusts' assets.

Shelton's statement that the annuities' death benefits would eventually repair the losses, assuming that such a representation was made, is nothing more than an admission by Shelton that losses did in fact occur. The plaintiff has not explained how the statement might constitute a "device to mislead the plaintiff in order to exclude suspicion or prevent inquiry." *Redwing*, 363 S.W.3d at 463.

21

The district court correctly found that the plaintiff's offerings on fraud and concealment were not adequate to withstand summary judgment, because they did not establish that the statute of limitations was tolled by the defendant's conduct.

IV.

For the reasons discussed above, the district court's judgment of dismissal is **AFFIRMED**.