IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 21, 2018 Session

## CRYSTAL HERPST v. PARKRIDGE MEDICAL CENTER, INC., ET AL.

Appeal from the Circuit Court for Hamilton County
No. 15C1351 Ward Jeffrey Hollingsworth, Judge

_____

### No. E2017-00419-COA-R3-CV

_____

This case involves a second healthcare liability action brought by Crystal Herpst on behalf of the estate of her deceased father, James Ingram. The defendants are Dr. LeAnthony A. Hardy – Mr. Ingram's treating physician – as well as Parkridge Medical Center, Inc., Chattanooga Diagnostic Associates, LLC, and Columbia Medical Group-Parkridge, Inc. (the Parkridge defendants). The trial court determined that plaintiff could not avail herself of Tennessee's saving statute because her first complaint was not filed prior to the expiration of the applicable statute of limitations. The court therefore dismissed plaintiff's second complaint as untimely filed. She appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined. W. NEAL MCBRAYER, J., filed a separate opinion concurring in the majority opinion except for part III of that opinion.

Buddy B. Presley, Jr., Chattanooga, Tennessee, for the appellant, Crystal Herpst.

H. Dean Clements, Chattanooga, Tennessee, for the appellees, Parkridge Medical Center, Inc., Chattanooga Diagnostic Associates, LLC, Columbia Medical Group-Parkridge, Inc.

Andrew R. Tillman, Chattanooga, Tennessee, for the appellee, Dr. LeAnthony A. Hardy.

## OPINION

### I.

The following statement of facts is derived from the face of the plaintiff's second

complaint filed on November 13, 2015. For the purpose of this Tenn. R. Civ. P. 12.02(6) analysis, the defendants do not contest the correctness of these alleged facts.

Mr. Ingram began suffering from mental illness at least one year prior to his death in July 2013. Prior to his demise, he was spending his nights with plaintiff. According to her, Mr. Ingram experienced paranoia and delusional episodes that led him to believe that persons were trying to assassinate him. He claimed that other people were "shooting lasers in his eyes" and "making him think really bad thoughts." More than once, he stated that he had no choice but to kill himself.

On June 27, 2013, Mr. Ingram visited his son's home and tripped on a piece of furniture. When he fell, a loaded firearm fell out of the waistband of his pants. Concerned for his safety, his family called the police and arranged for Mr. Ingram to be taken to Parkridge Hospital. The family chose Parkridge "specifically because it is the only hospital in Chattanooga that has a dedicated and secured floor for mental evaluations." When they arrived at the hospital, plaintiff and the deceased's wife spoke with Dr. Hardy for more than thirty minutes about the circumstances of Mr. Ingram's admission to the hospital. They specifically told Dr. Hardy that Mr. Ingram was an extreme danger to himself and others. Plaintiff also informed Dr. Hardy that she held his healthcare power of attorney and that, according to her, she "demanded a mental evaluation," which was the "primary reason" they brought Mr. Ingram to Parkridge. According to plaintiff, "Dr. Hardy witnessed Mr. Ingram directing senseless commentary to nurses and hospital staff, but did not order a mental evaluation."

The next day, June 28, 2013, the family "inquired as to when the mental evaluation would be ordered; however, they never received a direct answer." On June 29, 2013, "Mr. Ingram had become very agitated with being in the hospital. That same day, [plaintiff] asked the nurses' station when Mr. Ingram's mental evaluation was scheduled...[T]hey responded, 'we don't know, we don't care, we're tired of fooling with him…he's crazy.' " Mr. Ingram made multiple threats to hospital staff that he would leave the hospital. On June 30, 2013, he "pulled out his I.V.'s and monitor leads, got dressed and left the hospital." Sometime between July 1, 2013, and July 2, Mr. Ingram killed his wife and then committed suicide.

No later than July 3, 2013, plaintiff received notice of her parents' death. She did not conduct a "diligent review" of Mr. Ingram's medical records until about March 1, 2014. Plaintiff filed her original complaint on November 6, 2014. She nonsuited that case, on January 12, 2015. Relying on Tennessee's saving statute, plaintiff filed her second complaint on November 13, 2015. The second complaint alleged several acts of negligence, mostly revolving around defendants' alleged failure to assess Mr. Ingram's mental condition as well as their alleged failure to prevent Mr. Ingram from leaving the hospital.

## II.

Plaintiff essentially raises one issue on appeal:

> Whether the trial court erred in concluding that the statute of limitations began to run on July 3, 2013, making plaintiff's original complaint untimely and her second complaint subject to dismissal.

Defendants raise two additional issues:

> Whether dismissal is appropriate because of plaintiff's alleged failure to comply with the notice statute codified at Tenn. Code Ann. § 29-26-121.

> Whether dismissal is appropriate as to claims against Dr. Hardy because of plaintiff's alleged failure to timely serve Dr. Hardy with process or notice of the voluntary dismissal in plaintiff's first suit against him.

## III.

In this case, Dr. Hardy and the Parkridge defendants each filed a Rule 12.02(6) motion to dismiss. The trial court advised the parties that it believed it was necessary to "review and consider the original complaint filed in 2014" in order to decide whether that complaint was timely filed under the applicable statute of limitations period. Because the court treated the plaintiff's original complaint as being "outside the pleadings of this [second] case," the court characterized its dismissal as a grant of summary judgment.[1] On appeal, all parties challenge the trial court's decision to convert the defendants' Rule 12.02(6) motions into motions for summary judgment. The issue in this case is whether plaintiff's original complaint was a matter "outside the pleading." We agree with the litigants that the complaint filed in the original lawsuit is not something "outside the pleading."

This case is similar to the case of *Cochran v. City of Memphis*, No. W2012-01346-R3-CV, 2013 WL 1122803 (Tenn. Ct. App. 1996). In *Cochran*, the trial court held

---

[1] The court hastened to add, however, that it would have reached the same result if the court had reviewed the motions under Tenn. R. Civ. P. 12.

that a motion to dismiss in that case "was converted into a motion for summary judgment." In finding that the "conversion" was in error, we said the following:

> On appeal, we are asked to determine whether the trial court erred in granting the City's Motion to Dismiss Plaintiffs' Second Complaint for failure to state a claim. The City attached as exhibits to its motion to dismiss: (1) Ordinance No. 4907, annexing the South Cordova Area; (2) Plaintiffs' First Complaint filed December 18, 2001; (3) the April 20, 2011 "Order Dismissing Cause for Lack of Prosecution"; (4) the June 28, 2011 "Order Denying Motion to Set Aside Order of Dismissal; and (5) Ordinance No. 4908, annexing the Southeast Area. In ***Indiana State Dist. Council of Laborers v. Brukardt***, No. M2007-02271-COA-R3-CV, 2009 WL 426237, at *8-9 (Tenn. Ct. App. Feb. 19, 2009) *discretionary review denied* (Tenn. Aug. 24, 2009) [italics in original], the middle section of this Court, in allowing consideration of a proxy statement and a certificate of incorporation in resolving a motion to dismiss, cited with approval the following:
>
> > Numerous cases…have allowed consideration of matters incorporated by reference or integral to the claim, *items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered…without converting the motion [to dismiss] into one for summary judgment.*

***Cochran v. City of Memphis***, No. W2012-01346-R3-CV, 2013 WL 1122803 (Tenn. Ct. App. 1996) (emphasis added). We hold that the plaintiff's original complaint cannot properly be considered a matter "outside the pleading" for purpose of ruling on the statute of limitations issue.[2]

A trial court's decision to grant a motion to dismiss is a question of law that we review de novo with no presumption of correctness. ***Owens v. Truckstops of America***, 915 S.W.2d 420, 424 (Tenn. 1996). In our review, we "must construe the complaint

---

[2] Because the trial court did not reach the additional issues raised by the defendants (regarding pre-suit notice and service of process), we need not address whether the court's consideration of plaintiff's original complaint or other exhibits introduced by the parties would have been sufficient to convert the Rule 12 motions into summary judgment motions with respect to those issues.

liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. It is well-settled that a complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his or her claim that would warrant relief." ***Trau-Med of America, Inc. v. Allstate Ins. Co.***, 71 S.W.3d 691, 696 (Tenn. 2002) (citations omitted).

## IV.

## A.

As previously discussed, plaintiff filed her second complaint in reliance on Tennessee's saving statute. *See* Tenn. Code Ann. § 28-1-105(a). The saving statute allows a plaintiff to voluntarily dismiss her claim and file a second complaint within one year after the voluntary dismissal. *Id.* Importantly, however, a plaintiff can only rely on the saving statute "[i]f the action [wa]s commenced within the time limited by a rule or statute of limitation . . . ." *Id.*; *see also* ***Young ex rel. Young v. Kennedy***, 429 S.W.3d 536, 556 (Tenn. Ct. App. 2013) ("Only if the initial suit was filed within the applicable statute of limitations will the Saving Statute operate to revive the claim."). Thus, the dispositive issue becomes whether plaintiff's original complaint was filed within the appropriate statute of limitations period.

In this case, the parties agree that Tenn. Code Ann. § 29-26-116 sets forth the applicable statute of limitations. The relevant sections of that statute state the following:

> (a)(1) The statute of limitations in health care liability actions shall be one (1) year as set forth in § 28-3-104.
>
> (2) In the event the alleged injury is not discovered within such one-year period, the period of limitation shall be one (1) year from the date of such discovery.

Tenn. Code Ann. § 29-26-116(a)(1)-(2).

In ***Sherrill v. Souder***, the Supreme Court thoroughly explained the origin, evolution, and current interpretation of Tenn. Code Ann. § 29-26-116(a)(2), now known as the "discovery rule." In summary, the Court stated:

> [A] medical malpractice cause of action accrues when one discovers, or in the exercise of reasonable diligence should have discovered, both (1) that he or she has been injured by wrongful or tortious conduct and (2) the identity of the person or persons whose wrongful conduct caused the injury. A claimant need not actually know of the commission of a

- 5 -

wrongful action in order for the limitations period to begin, but need only be aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another. If enough information exists for discovery of the wrongful act through reasonable care and diligence, then the cause of action accrues and the tolling of the limitations period ceases. Neither actual knowledge of a breach of the relevant legal standard nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a medical malpractice cause of action.

*Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010).

In other cases, our courts have used the terms "constructive notice" or "inquiry notice" when referring to "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *E.g.*, ***Redwing v. Catholic Bishop for Diocese of Memphis***, 363 S.W.3d 436, 459 (Tenn. 2012) (footnotes omitted). This type of notice "charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed . . . ." *Id.* (quoting *Sherrill*, 325 S.W.3d at 593 n.7). We have previously held that

the determination of when a plaintiff had constructive knowledge of facts sufficient to put him or her on notice pursuant to the discovery rule is a question for the trier of fact. However, where the undisputed facts demonstrate that no reasonable trier of fact could conclude that a plaintiff did not know, or in the exercise of reasonable care and diligence should not have known, that he or she was injured as a result of the defendant's wrongful conduct, Tennessee case law has established that judgment on the pleadings or dismissal of the complaint is appropriate.

*Young ex rel. Young*, 429 S.W.3d at 557-58 (citations omitted).

In this case, the trial court determined that plaintiff had actual knowledge of her alleged injury no later than July 3, 2013. Based solely on the allegations in plaintiff's second complaint, the trial court concluded:

1. No later than July 3, 2013, Ms. Herpst knew her father and mother were dead as a result of her father's actions.

2. Before July 3, 2013, Ms. Herpst knew she had demanded a

mental evaluation by Dr. Hardy when her father was taken to Parkridge Hospital.

3. She knew the mental evaluation was not done.

4. She knew her father walked out of the hospital on [June] 30, 2013, because a hold had not been placed on him due to the hospital's failure to do the evaluation.[3]

The court added that "[a]t a minimum, the Plaintiff had sufficient facts to put her on notice that she had a claim at that time." We interpret this statement as an alternative holding that if plaintiff did not have actual knowledge of the alleged injury by July 3, 2013, she at least did have "constructive" or "inquiry" notice of the existence of a potential claim. If the trial court correctly determined the date on which the statute began to run, the limitations period would have ended on July 3, 2014. Even assuming plaintiff complied with the pre-suit notice requirements of Tenn. Code. Ann. § 29-26-121, which extends the limitations period by 120 days, she would only have had until October 30, 2014 to file her complaint. Either way, plaintiff's original complaint, filed November 6, 2014, would have been untimely under the trial court's ruling. We will now separately address the trial court's ruling that plaintiff had *actual knowledge* of her potential claim, and, in the alternative, whether plaintiff had *constructive knowledge* of her potential claim.

**B.**

Plaintiff argues that the trial court erred in concluding that she had actual knowledge of the alleged injury on July 3, 2013. She primarily attacks two conclusions of the trial court: (1) that plaintiff "knew the mental evaluation was not done" and (2) that plaintiff "knew her father walked out of the hospital on [June] 30, 2013, because a hold had not been placed on him due to the hospital's failure to do the evaluation."[4] Plaintiff argues that these conclusions "clearly contradict the actual complaint filed in this matter and are not a reasonable inference from any matters stated in the complaint."

We agree with plaintiff that, when all factual allegations in the complaint are taken as true and all reasonable inferences are drawn in favor of plaintiff, there is not sufficient evidence that plaintiff had *actual knowledge* on July 3, 2013 that defendants failed to

---

[3] The trial court's memorandum and order actually states that Mr. Ingram walked out of the hospital on "July 30, 2013." This is obviously a clerical error, as evidenced by the trial court's correct citation of the date elsewhere in its order. The parties agree that this is a clerical error.

[4] Plaintiff also takes issue with the trial court's restatements of paragraphs 7 and 10 of the complaint. Because plaintiff concedes that these statements of fact are "not critical to the overall complaint or opinion of the Trial Court," we decline to address the significance of those perceived errors.

perform a mental evaluation. With respect to the mental evaluation, the complaint only alleges plaintiff's actual knowledge that:

> *During his being admitted to the hospital*, Dr. Hardy witnessed Mr. Ingram directing senseless commentary to nurses and hospital staff, but did not order a mental evaluation. [Paragraph 29, emphasis added]
>
> The day following his admission, the family members inquired as to when the mental evaluation would be ordered, however *they never received a direct answer*. [Paragraph 30, emphasis added]
>
> [On June 29, 2013] Ms. Herpst asked the nurses' station when Mr. Ingram's mental evaluation was scheduled when they responded *"we don't know*, we don't care, we're tired of fooling with him . . . he's crazy." [Paragraph 32, emphasis added]
>
> Ms. Herpst . . . was able to determine through such medical records the negligence and failure to provide the standard of care by Defendants *after . . . a review of such records on or about March 1, 2014*. [Paragraph 45, emphasis added]

Taking the allegations of paragraph 45 as true, we must conclude that plaintiff did not have actual knowledge that defendants failed to perform a mental evaluation (which would be noted in Mr. Ingram's medical records) until March 1, 2014. Although plaintiff and other family members had inquired about the mental evaluation prior to the death of Mr. and Mrs. Ingram, one could reasonably infer that the ambiguous responses of hospital staff did not definitively answer whether a mental evaluation had been performed or scheduled.

We now turn to the trial court's conclusion that plaintiff "knew her father walked out of the hospital on [June] 30, 2013, because a hold had not been placed on him due to the hospital's failure to do the evaluation." We agree with plaintiff that the complaint does not directly assert the entirety of this statement. The complaint does state that "on Sunday, June 30, 2013, Mr. Ingram pulled out his I.V.'s and monitor leads, got dressed and left the hospital." However, the complaint does not assert that the hospital failed to place a "hold" on Mr. Ingram. Whether that fact can be reasonably inferred is debatable. Because we must draw reasonable inferences in favor of the non-moving party, we cannot say that plaintiff had *actual knowledge* that Mr. Ingram left the hospital "because a hold had not been placed on him."

- 8 -

## C.

We now turn to the *trial court's alternative holding* that "[a]t a minimum, the plaintiff had sufficient facts to put her on notice that she had a claim [by July 3, 2013]." In opposition to this finding, plaintiff asks us to consider two cases: ***Hoffman v. Hospital Affiliates, Inc.***, 652 S.W.2d 341 (Tenn. 1983) and ***Foster v. Harris***, 633 S.W.2d 304 (Tenn. 1982).

In ***Hoffman***, the plaintiff fell at her home and consulted with the defendant medical professionals the following day. 652 S.W.2d at 342. The defendants incorrectly advised plaintiff that she did not break any bones. *Id.* About three months after the alleged malpractice, plaintiff learned that she had, in fact, broken three bones. *Id.* She filed her complaint within one year of discovering the injury but not within one year of the alleged malpractice. *Id.* On appeal, the Court considered whether the statute of limitations began to run on the date that the plaintiff discovered her injury even though that discovery occurred within one year of the alleged malpractice. *Id.* at 344.

We agree with defendants that plaintiff's reliance on ***Hoffman*** is entirely misplaced. In this case, the dispositive issue is when plaintiff discovered or should have discovered that she had a healthcare liability claim. In ***Hoffman***, the date of discovery was undisputed and the issue explored by the Court was completely different than the case at bar.

In ***Foster***, the plaintiff contracted hepatitis from his dentist when his dentist cut himself during a procedure, causing his blood to intermingle with the plaintiff's. 633 S.W.2d at 304. At the time, the plaintiff was unaware that his dentist had hepatitis. *See id.* The plaintiff was diagnosed with the disease about three months after the procedure; however, he did not learn that he had contracted hepatitis from his dentist until about six months after his diagnosis. *Id.* The Court held that that the plaintiff discovered *the injury* at the time of his diagnosis, but the statute of limitations did not begin to run until the plaintiff discovered *the source of the disease* and *the identity of the tortfeasor*. *Id.* at 304-05.

Here, plaintiff argues that her case is similar to ***Foster***. Specifically, plaintiff concedes that, like the plaintiff in ***Foster***, she knew of her injury before the limitations period had expired. She received notice of her parents' death no later than July 3, 2013. However, plaintiff argues that, like the plaintiff in ***Foster***, she "had no knowledge of any medical malpractice because she was not present when her father left the hospital and had no knowledge of who might have been responsible."

We agree with defendants that plaintiff's case is not sufficiently similar to ***Foster***. In ***Foster***, the plaintiff contracted a disease that presumably could have been contracted

- 9 -

in a variety of ways. However, the plaintiff in that case did not learn the precise origins of the disease until he received specific information that his dentist had hepatitis when he performed a procedure on him nine months earlier. *Id.* at 304. Here, in contrast, Mr. Ingram was in the exclusive care and control of defendants from the moment he stepped foot in Parkridge hospital. The complaint also specifically states that plaintiff personally spoke with the doctor and nurses involved in her father's treatment. Unlike *Foster*, if there was a tortfeasor, or tortfeasors, plaintiff certainly knew their identities.

In addition to knowing the identities of the defendants, plaintiff also had knowledge of numerous other facts that were sufficient to put her on notice that she had a negligence claim. Plaintiff's complaint states that the family chose to take Mr. Ingram to Parkridge "specifically because it is the only hospital in Chattanooga that has a dedicated and secured floor for mental evaluations." Thus, by July 3, 2013, plaintiff knew that her father had escaped from the only area hospital with a "secured floor" for mental evaluations. Even though plaintiff probably did not have actual knowledge that a mental evaluation had been performed (as discussed above), her complaint makes clear that she had *reason to doubt* that the requested evaluation had been performed. According to the complaint, when she inquired about the evaluation defendants never provided a direct answer. She also personally spoke with nurses who expressed indifference and even hostility toward her father.

All of these facts demonstrate that by July 3, 2013 plaintiff had constructive notice of her medical malpractice claim. Upon learning that her father had escaped from the hospital and killed both his wife and himself, a reasonable person would have realized the need to further investigate the injury, especially in light of plaintiff's prior dealings with hospital staff.

Plaintiff reminds us that the issue of constructive notice is usually reserved for the trier of fact. As we stated earlier in this opinion, that is generally the case:

> However, where the undisputed facts demonstrate that no reasonable trier of fact could conclude that a plaintiff did not know, or in the exercise of reasonable care and diligence should not have known, that he or she was injured as a result of the defendant's wrongful conduct, Tennessee case law has established that judgment on the pleadings or dismissal of the complaint is appropriate.

*Young ex rel. Young*, 429 S.W.3d at 557-58 (citations omitted).

In our view, no reasonable trier of fact could conclude that plaintiff, in the exercise of reasonable care and diligence, should not have known that she was injured as a result of the defendants' allegedly wrongful conduct. In fact, taking the allegations of the

complaint as true, it would be hard to imagine a scenario in which defendants were *not* negligent.

Consequently, the statute of limitations began to run by July 3, 2013 at the latest. Plaintiff's original complaint was untimely filed and she cannot rely on the saving statute to preserve her claim. Because we affirm the trial court's dismissal of the case on statute of limitations grounds, we need not address the additional issues raised by defendants regarding pre-suit notice and service of process.

## V.

The judgment of the trial court is affirmed as modified. The costs on appeal are assessed to the appellant, Crystal Herpst. The case is remanded for collection of costs as assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE