IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2019 Session

## TERESA M. DAFFRON, AS DAUGHTER, NEXT OF KIN TO AND AS THE ADMINISTRATOR OF THE ESTATE OF WILEY E. DAFFRON v. MEMORIAL HEALTH CARE SYSTEM, INC.

**Appeal from the Circuit Court for Hamilton County**
**No. 15C1011      Ward Jeffrey Hollingsworth, Judge**

_____

### No. E2018-02199-COA-R3-CV

_____

This appeal arises from a wrongful death action based on health care liability. Wiley E. Daffron ("Decedent") received medical treatment from Memorial Health Care System, Inc. ("Memorial") in 2013. During his stay at Memorial, Decedent developed a pressure ulcer. Decedent died a few months after he was discharged from Memorial. Teresa M. Daffron ("Ms. Daffron"), Decedent's adult daughter, obtained Decedent's medical records from Memorial. Some 13 months later, Ms. Daffron sent pre-suit notice of her intent to sue Memorial. A few months after that, Ms. Daffron filed suit against Memorial in the Circuit Court for Hamilton County ("the Trial Court"). Memorial filed a motion for summary judgment asserting the statute of limitations, which the Trial Court granted. The Trial Court held that Ms. Daffron knew or should have known of Decedent's injury and its possible cause more than one year before the pre-suit notice was sent and, therefore, her complaint was filed outside the statute of limitations. On appeal, Ms. Daffron argues that the statute of limitations did not begin to run until an expert informed her that Decedent's injury was caused by Memorial. We hold that, pursuant to the discovery rule, and, as evidenced by, among other things, her seeking through counsel Decedent's medical records, Ms. Daffron had constructive knowledge of Decedent's claim more than one year before she sent pre-suit notice and, therefore, the complaint was not timely filed. Ms. Daffron's claim brought on behalf of her father is barred by the statute of limitations. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

G. Brent Burks and Tim O. Henshaw, Chattanooga, Tennessee, for the appellant, Teresa M. Daffron, as daughter, next of kin to and as the administrator of the estate of Wiley E. Daffron.

Arthur P. Brock and Jamieson Brock, Chattanooga, Tennessee, for the appellee, Memorial Health Care System, Inc.

**OPINION**

**Background**

Decedent, who suffered from diabetes, began living with Ms. Daffron in November 2011. Ms. Daffron assisted her father closely in managing his health issues. Decedent signed a health care power of attorney allowing Ms. Daffron to make medical decisions on his behalf. Of particular relevance, Ms. Daffron knew that Decedent could develop sores without proper skincare.

On November 1, 2013, Decedent was admitted to Memorial for an arthroscopic procedure. After three days, Decedent suffered complications for which he was intubated. On November 10, 2013, Decedent was extubated. On November 11, Ms. Daffron discovered that Decedent had two sores on his buttocks. Ms. Daffron consented to a debridement.[1] On November 20, Decedent was transferred to Kindred Hospital, where he stayed for several days. Decedent then returned to Memorial for a second debridement. Decedent went back to Kindred Hospital before being discharged to hospice and, finally, his home.

In December 2013, Ms. Daffron had a chance conversation with a nurse at Memorial who advised her to look into her father's care. Ms. Daffron shortly thereafter contacted the McMahan Law Firm, which represents her now on appeal. In February 2014, Ms. Daffron, through counsel, requested Decedent's medical records from Memorial. On March 17, 2014, Ms. Daffron obtained Decedent's medical records. On April 28, 2014, Decedent died allegedly due to Memorial's health care negligence. According to Ms. Daffron, she became aware of Memorial's alleged negligence only when informed by her expert, Dr. Sexson, in March 2015.

On April 21, 2015, Ms. Daffron sent Memorial pre-suit notice of a pending health care liability action. On August 24, 2015, Ms. Daffron sued Memorial in the Trial Court. In its answer, Memorial asserted the statute of limitations as a defense. In July 2018,

---

[1] Debridement means "the usually surgical removal of lacerated, devitalized, or contaminated tissue." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/debridement (last visited October 1, 2019).

Memorial filed a motion for summary judgment. In its brief in support of its motion for summary judgment, Memorial detailed its argument as to why Ms. Daffron's suit was not timely filed, stating in part:

> The statute of limitations for health care liability actions is one year. *T.C.A.* § 29-26-116. If prior to one year notice of a claim is sent to a defendant in a health care liability action, the statute of limitations is extended for one hundred twenty (120) days pursuant to *T.C.A.* § 29-26-121. A claim is barred by the statute of limitations if no notice is sent within a year of the accrual of the action or — presuming timely notice — if the lawsuit is filed four hundred eighty five (485) days after cause accrues. *Id*.; *T.C.A.* § 29-26-116. Mr. Daffron was discharged from Memorial on December 20, 2013, and was not treated there again before his death on April 28, 2014. Exhibit 1 of *Affidavit of Dawn Walker*, Attached to Memorial's Motion for Summary Judgment as Exhibit B (hereinafter "*Memorial Records*"), at MH03656. Notice was sent on April 21, 2015, and this lawsuit was filed on August 24, 2015. *Compl*. Memorial's Motion seeks dismissal of this action because, as stated in the Complaint, Mr. Daffron developed these complications *while* he was at Memorial; therefore, notice was not sent within a year and the Complaint was not filed within 485 days as required by statute, and should be dismissed with prejudice as a matter of law.

In her response to interrogatories, Ms. Daffron stated the following as to her understanding of how Decedent was injured:

> 8. Please described [sic] in detail your* understanding of how the alleged occurrence* happened, presenting all the events leading up to Mr. Daffron's alleged injuries in the order in which they occurred.
>
> ANSWER: He was admitted on November 1, 2013, to Memorial for an endoscope and it was discovered that he had aspiration pneumonia and he was treated for such over the weekend. On November 4, 2013, he was cleared by respiratory and anaesthesia for the endoscope procedure. The procedure was performed with no complications to my knowledge. Later the same evening he had issues maintaining his $O^2$ saturations and he was intubated and transferred to the CCU unit. He remained on the ventilator until November 10, 2013, and once it was removed he was doing well. On November 11, 2013, it was discovered by me that while on the ventilator and not receiving proper skin care, he developed 2 separate bed sores on his

buttocks. The wound care physician was called in the same day to assess the wounds and a rectal catheter was placed that day as well.

In her deposition, Ms. Daffron testified in detail as to her first realization that something was wrong with her father's medical care, as well as what steps she took upon this realization:

Q. Okay. I know this will sound like a silly question, but you were upset because of what you saw.
A. I was upset because of what I saw and that, all the years that I'd worked hard for that not to happen while he was at home, for that to happen in a hospital.

***

Q. Okay. Did you discuss what you saw with [Decedent]?
A. I asked him did his back hurt, and he said: "I've been telling y'all for days my back hurt."
Q. Okay.
A. And I said: "Well, you've got some kind of sore back there that the doctor's going to come look at." And he's like: "Why do I have a sore?" And I'm like: "Daddy, I don't know."

***

Q. Okay. "On November 11, 2013, it was discovered by me that, while on the ventilator and not receiving proper skin care, he developed two separate bedsores on his buttocks." Now, we've talked about that as well. Right?
A. Yes.
Q. I just want to make sure I understand. When you say it was discovered by you --
A. From the nurse telling me they needed to clean his wound.
Q. Okay. And then you went in there and actually saw it.
A. Correct.
Q. Okay. The part about "discovered by me that, while he was on the ventilator," that information came to you from the physician, or did you just --
A. From the nurse.
Q. From the nurse.
A. That told me she needed to clean his wounds.

Q. Okay. But this part about, "while on the ventilator and not receiving proper skin care," did that come from -- how did that -- you discover that information?

A. Common sense.

Q. Okay.

A. On the 4th, after his procedure, he had no skin tears, no skin wounds, no pressure sores. I helped him clean up because his catheter was leaking, which is why it needed to be replaced on the 4th before we left to go home after visiting him. I helped clean up the urine, lotioned his back, lotioned his legs. There were no sores. On the 10th, there's two.

Q. Okay. And that -- one of the reasons you had been doing all that stuff at home was to help prevent something like this?

A. Yes.

Q. Then it says: "The wound-care physician was called in the same day to assess the wounds, and a rectal catheter was placed that day." We've talked about that. Right?

A. Dr. Barnett.

Q. Okay. And he continued to see Dr. Barnett for quite a while for this wound.

A. Until he was transferred to Kindred.

Q. Okay. He went from Memorial to Kindred. Correct?

A. Yes.

Q. And then back to Memorial.

A. Yes.

***

Q. When did you first approach an attorney about looking into your father's situation?

A. After a chance meeting on an elevator.

Q. When was that?

A. After his major debridement surgery, I had run into the nurse that actually told me, by accident, that he had the wound; and she asked me how he was doing. I told her he was still here, that he'd just had a major surgery. And she said: "Sweetie, you need to really go talk to somebody about what happened to your dad."

Q. Is this while he was in Memorial --

A. No.

Q. -- in December?

A. Yes.

Q. Do you know this nurse's name?

A. I don't.
Q. Do you know what she looks like?
A. Blondish, I guess. I don't -- I don't remember.
Q. Okay.
A. Whoever was taking care of him on the 11th. It was the same nurse.
Q. Okay. So this was the nurse who first told you that they needed to clean the wound --
A. Correct.
Q. -- on November 11th?
A. Correct.
Q. And then, in December of 2013, on the elevator, she told you you really needed to do what?
A. "You need to talk to somebody about what happened to your dad."
Q. Okay. And you took that to mean you really needed to go talk to a lawyer?
A. No. I took that to mean I needed to find out what was going on. And when I got no answers from everybody I talked to is when I decided I needed to talk to a lawyer.
Q. And when did you first speak to a lawyer?
A. I don't remember.
Q. Was it in December?
A. I don't remember.
Q. Who was the first lawyer you spoke with?
A. Mr. Poole.
Q. Did you speak to Mr. Poole by phone?
A. Initially, yes.

Ms. Daffron later filed an affidavit seeking to clarify her deposition testimony, particularly the part where she stated that she knew from "common sense" that Decedent had received improper skincare at Memorial. In her affidavit, Ms. Daffron stated:

1. I am over eighteen (18) years of age and of sound [mind].
2. This Affidavit is based upon my own personal knowledge.
3. I am [the] daughter of Wiley Daffron, whose death I believe was caused by the negligent acts and omissions of Memorial Health Care System, Inc.
4. As I have testified under oath in a deposition, I discovered on November 11, 2013, that my father Wiley Daffron, had been diagnosed with a pressure ulcer.
5. At that time, I asked numerous questions about how the ulcer had occurred.

6. No one, between my father's doctors, hospital staff or nurses would explain to me how the pressure ulcer had occurred and how it had gotten so bad so quickly.

7. As result of their silence, I could not ascertain any of the following:

a. Who if, anyone, initially documented the pressure ulcer;

b. Who, if anyone, continued to document the pressure ulcer;

c. Who, if anyone, ordered preventative or interventional measures;

d. Who, if anyone, provided preventative or interventional measures;

e. Who, if anyone, called in to Dr. Barnett to debride the pressure ulcer;

f. Who, if anyone, made the decision to transfer him out of the hospital.

8. Generally, although I knew that my father had a pressure ulcer, I did not know why it occurred or who was responsible at any point in 2013 or 2014.

9. It was not until Dr. James Sexson, the expert who reviewed my father's medical records from his stays at Memorial, Kindred and Hospice Care, finished his evaluation and made his conclusions in March 2015 that I knew Memorial Health Care System, Inc. was the entity and/or person responsible for my father's injuries and untimely death.

10. In my deposition, my response that it was "common sense" to Mr. Brock's question about my interrogatory response number 8 was only intended to mean it was common sense he got the sore while at Memorial in the CCU because it did not exist on November 4, 2013, prior to his entry into the CCU.

11. I did not know in November 2013 or at any time prior to March 2015 that my father's injuries were caused by the negligence of Memorial Hospital.

12. Specifically, if I had known in November 2013 or December 2013 that Memorial's negligence caused my father's injuries I would not have consented to his continued care at that hospital and would have insisted on his removal to another facility.

13. I acted with reasonable care and diligence to discover the entity and/or person responsible for my father's injuries and death.

14. All phone conversations, written communications and/or any other communications of any type between myself and McMahan Law Firm at any point in time were related to legal advice I sought out. I refuse to disclose the contents of those discussions and the nature of any advice I received because this would violate my civil rights to seek legal advice from any attorney of my choosing. Additionally, I do not consent to the attorneys and/or staff at McMahan Law Firm from disclosing the contents or nature of any of my privileged communications with them.

Further, the affiant sayeth not.

Memorial's motion for summary judgment was heard in October 2018. In November 2018, the Trial Court granted Memorial's motion on the basis of the "discovery rule." The Trial Court stated in its order, in pertinent part:

> The Defendant argues that the undisputed facts show that Ms. Daffron knew her father had developed pressure sores on November 11, 2013. She knew that those sores developed while her father was in the care of the Defendant, Memorial Hospital. Therefore, she knew of the injury, that the injury was or could have been caused by a failure to provide proper skin care, and it was employees of Memorial who failed to provide that care.
>
> Therefore, on November 11, 2013, she knew the injury, the manner by which the breach of duty occurred and the identity of the Defendant who breached the duty in November, 2013. Then, in December 2013, a nurse at Memorial told her to talk to someone about what had happened to her father. In her deposition, Ms. Daffron said it was after that conversation and her inability to get anyone at Memorial to tell her anything that she contacted a lawyer. It is undisputed that the first telephone call was on December 9, 2013. Although it was not included in the undisputed facts listed in this Memorandum Order, it does not seem to be disputed that Ms. Daffron and her lawyers had Wiley Daffron's medical records in March, 2014. As noted, it is undisputed that the pre-trial notice was sent on April 21, 2015, more than one (1) year after all of the events listed above.
>
> In her response, Ms. Daffron argues that Memorial tried to conceal their negligence. However, in her brief, she states that on November 11, 2013, nurses tried to keep her from entering her father's room. She says "only after pressing did the same nurse tell Teresa that her father had a wound they needed to clean." It is undisputed that Ms. Daffron saw the wound on that day. If the incident outside the room occurred as described by Ms. Daffron, that should have heightened her suspicion that something was amiss. She goes on to say that no one told her the severity of the wound. However, she was aware that same day a debridement of the wound occurred. She says in her brief that she had ". . . a million questions, including several that her father's physicians would not answer." She goes on to argue that she had no way of confirming Memorial's negligence until April 24, 2014.

***

> Although Ms. Daffron may not have had all the details, she knew on November 11, 2013 that her father developed pressure sores while in the

-8-

care of Memorial and that her father had not developed such sores in the two years he had been in her care, because she provided appropriate skin care. At the outside, she knew she had a right of action after the Memorial nurse told her to talk to someone about her father's care in December, 2013 and she, as a result of that conversation, contacted a lawyer that same month.

The statute of limitations began to run no later than December, 2013. The pre-suit notice required by T.C.A. § 29-26-121 extends the statute only if the pre-suit notice is sent within the original [one] year statute. It was not. Therefore, the statute had expired.

Summary judgment is Granted to the Defendant and the Plaintiff's complaint is Dismissed with prejudice.

Ms. Daffron timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Ms. Daffron raises the following issue on appeal: whether the Trial Court erred in granting Memorial's motion for summary judgment on grounds that Ms. Daffron knew or should have known of Decedent's cause of action more than one year prior to her sending pre-suit notice of the health care liability action.

This case was resolved on a motion for summary judgment. As our Supreme Court has instructed as to our standard of review:

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\*\*\*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

For wrongful death actions rooted in health care liability, Tennessee courts apply a one year statute of limitations as adopted by our General Assembly. Tenn. Code Ann. § 29-26-116(a)(1) (2012); *Holliman v. McGrew*, 343 S.W.3d 68, 74 (Tenn. Ct. App. 2009). "When notice is given to a provider as provided in this section, the applicable statutes of limitations and repose shall be extended for a period of one hundred twenty (120) days from the date of expiration of the statute of limitations and statute of repose applicable to that provider." Tenn. Code Ann. § 29-26-121(c) (2012). "In the event the alleged injury is not discovered within such one-year period, the period of limitation shall be one (1) year from the date of such discovery." Tenn. Code Ann. § 29-26-116(a)(2) (2012). Our Supreme Court has outlined the discovery rule as follows:

> In summary, a medical malpractice cause of action accrues when one discovers, or in the exercise of reasonable diligence should have discovered, both (1) that he or she has been injured by wrongful or tortious conduct and (2) the identity of the person or persons whose wrongful conduct caused the injury. A claimant need not actually know of the commission of a wrongful action in order for the limitations period to begin, but need only be aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another. If enough information exists for discovery of the wrongful act through reasonable care and diligence, then the cause of action accrues and the tolling of the limitations period ceases. Neither actual knowledge of a breach of the relevant legal standard nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a medical malpractice cause of action.

*Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010). The cause of action accrues and the statute of limitations begins not only when a plaintiff acquires actual knowledge of a claim but also upon a plaintiff's constructive or inquiry notice of a claim. *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012). While the question of whether a plaintiff had constructive knowledge typically is for the trier of fact to decide, judgment on the pleadings or dismissal is appropriate where the undisputed facts demonstrate that no reasonable trier of fact could conclude that a plaintiff should not have known through the exercise of reasonable care and diligence that she was injured as a result of a defendant's wrongful conduct. *Young ex rel. Young v. Kennedy*, 429 S.W.3d 536, 557-58 (Tenn. Ct. App. 2013).

In a wrongful death health care liability action, Tennessee courts have considered whether the plaintiff bringing the suit, rather than the decedent, was put on notice of an

actionable wrong.  *Holliman*, 343 S.W.3d at 75; *Young*, 429 S.W.3d at 559.[2]  We are therefore tasked with determining whether Ms. Daffron, rather than Decedent, had actual or constructive knowledge of the claim at the pertinent times.  Elaborating further upon the discovery rule, our Supreme Court stated:

> [T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages, or until the plaintiff knows the specific type of legal claim it has.  The discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim.

*Redwing*, 363 S.W.3d at 459 (internal citations omitted).

Ms. Daffron cites to *Luna v. St. Thomas Hosp.*, 272 S.W.3d 577 (Tenn. Ct. App. 2007) for the proposition that, when a plaintiff is confronted with multiple possible defendants, the question of notice lends itself to determination by the trier of fact.  In the present case, Decedent spent some time at Kindred Hospital in addition to Memorial and had numerous individual providers over the course of his medical episode.  In *Luna*, the plaintiff suspected that a delay in surgery caused her husband's death but did not initially grasp the hospital's role.  *Id*. at 583.  This Court noted that "[w]hen a plaintiff suspects wrongful conduct that could have originated from any of several potential defendants, the constructive knowledge analysis becomes more complex."  *Id*. at 582.  We then discussed as follows:

> To establish that Mrs. Luna should have discovered the residents' alleged wrongful acts more than a year prior to filing her lawsuit, St. Thomas Hospital relies on paragraph twenty-three from her complaint against Doctors Pruitt and Cohen, which states as follows:
>
> > After Mr. Luna's death, Mrs. Luna and some of her husband's kin became concerned about why Mr. Luna had died while in the hospital and under the constant care of physicians and hospital staff personnel.  They wanted to know if any of Mr.

---

[2] The parties never broach the question of Decedent's knowledge.  We have misgivings about an analysis centered on Ms. Daffron's knowledge when, from the record before us, she had no authority to file a health care liability suit on her Father's behalf while he was alive.  This also raises the question of when the statute of limitations would have started to run if an individual other than Ms. Daffron had brought this wrongful death health care liability action.  Nevertheless, both parties agree that Ms. Daffron's knowledge is what is at issue, and, based on the applicable precedents, that is the state of the law.  We proceed on that basis.

Luna's healthcare providers were negligent in any way that caused or substantially contributed to his death. Accordingly, later in December 2003, Mrs. Luna sought and received from St. Thomas Hospital what is presumed to be most of Mr. Luna's hospital records. It was after those records were reviewed, and within one year prior to the filing of this Complaint, that Mrs. Luna discovered the facts, as alleged above, which she feels evidence causative negligence by Drs. Pruitt and Cohen, as alleged below.

Nothing in this paragraph indicates that Mrs. Luna possessed facts beyond the obvious one, that her husband died from complications associated with a bleeding ulcer while under the continuous care of hospital staff and physicians. St. Thomas Hospital would have this Court hold that Mrs. Luna had constructive notice of the hospital's potential negligence by virtue of the fact that the alleged tortious conduct occurred while her husband was a patient there. We decline to conclude as a matter of law that this information, without more, commenced the running of the statute of limitations.

\*\*\*

If a board certified general surgeon detected nothing in the medical records themselves to suggest wrongful conduct on the part of the residents, we find it difficult to expect Mrs. Luna to have done so. We hold that the affidavit placed into dispute the factual question of Mrs. Luna's constructive knowledge of her cause of action against the hospital. The trial court should have denied the hospital's motion for summary judgment and allowed the trier of fact to determine whether or not Mrs. Luna should have discovered her cause of action against the hospital more than a year before she filed suit against it.

*Luna*, 272 S.W.3d at 583-84.

With the relevant Tennessee law in mind, we turn to the present case. Ms. Daffron sent her pre-suit notice on April 21, 2015. Ms. Daffron filed her complaint on August 24, 2015. The complaint was timely filed only if the pre-suit notice was filed within the statute of limitations. The dispositive question is whether Ms. Daffron discovered or should have discovered Decedent's cause of action before April 21, 2014. If Ms. Daffron discovered or should have discovered the claim before April 21, 2014, her claim is barred by the statute of limitations because pre-suit notice was not given within one year of the

-13-

date of discovery and, therefore, the complaint was not filed timely, all as held by the Trial Court. Ms. Daffron contends that the question is unsuitable for resolution on summary judgment. To resolve the issue, we review the undisputed material facts.

The record reflects that Ms. Daffron was deeply familiar with her father's medical condition and assisted him in his final years. Ms. Daffron lived with Decedent as of 2011. On November 11, 2013, Ms. Daffron discovered the sores on Decedent. She knew these sores could have resulted from improper skincare. When asked at her deposition how she knew this, Ms. Daffron replied: "common sense." While Ms. Daffron also testified that she told Decedent she did not know why he had the sores, she explained in her testimony that she knew improper skincare led to such sores and that she had worked hard to prevent them. Indeed, Ms. Daffron rightfully was upset.

Ms. Daffron later sought to clarify her deposition testimony by means of an affidavit. In this affidavit, Ms. Daffron stated that her "common sense" testimony was "intended to mean it was common sense he got the sore while at Memorial in the CCU because it did not exist on November 4, 2013, prior to his entry into the CCU." Memorial argues that Ms. Daffron should not be able to manufacture a question of material fact by contradicting herself. When a party introduces an affidavit contradicting her earlier deposition testimony, "[i]n the absence of a satisfactory explanation for this change in testimony, we are justified in ignoring the affidavit." *Sampson v. Wellmont Health System*, 228 S.W.3d 124, 138 (Tenn. Ct. App. 2007).

To the extent Ms. Daffron contradicted herself, we find her explanation unavailing. Ms. Daffron's deposition testimony was crystal clear. She knew Decedent's sores could have been caused by improper skincare. Ms. Daffron was deeply familiar with her father's health problems, having lived with him and assisted him. She was upset when she saw the sores because she had worked hard to prevent them herself. Ms. Daffron's affidavit does nothing to negate her deposition testimony.

Notwithstanding all of this, sores of the type developed by Decedent can occur even in the absence of negligence. While Ms. Daffron arguably was put on notice of a claim when she discovered the sores given her deep familiarity with her father's condition, in our judgment this alone does not establish Ms. Daffron's knowledge such that no reasonable trier of fact could find otherwise. Ms. Daffron's actions in the weeks and months that followed, however, are another matter.

In December 2013, Ms. Daffron was advised by a nurse that she ought to look into her father's treatment. She testified that this nurse was "[w]hoever was taking care of him on the 11th. It was the same nurse." After this encounter, Ms. Daffron reached out to a law firm. Ms. Daffron argues that whatever communications she may have had with

a lawyer are privileged and should not be considered. However, we need not consider the content of her communications. The only relevant point for our analysis is that the communications showed, objectively, that Ms. Daffron knew her father had a claim warranting investigation. When asked at her deposition when she first talked to a lawyer, Ms. Daffron answered that it occurred after the chance meeting with the nurse. Ms. Daffron thus related her awareness of a potential legal issue to her conversation with the nurse. Despite these undisputed facts, Ms. Daffron asserts that she only truly discovered Memorial's role when informed by her expert in March 2015, and, according to her, only then did the statute of limitations begin to run. Ms. Daffron relies heavily on the *Luna* case for her position.

We find this case distinguishable from *Luna*. Unlike the situation in *Luna*, Ms. Daffron has pointed to no facts indicating that her knowledge of Memorial's alleged wrongful conduct was premised on the later discovery of new facts. We do not interpret *Luna* to mean that a claim accrues only when an expert gives a plaintiff the go ahead. Our Supreme Court has made it clear that "[N]either . . . nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a [health care liability] cause of action." *Sherrill*, 325 S.W.3d at 595. It is conceivable that a plaintiff could first become aware of her claim for purposes of the discovery rule in this manner, but that is not what happened here. Here, there was a succession of events reflecting Ms. Daffron's awareness that her father had been injured by Memorial's wrongful acts long before she received an expert's opinion.

Nevertheless, Ms. Daffron states that the medical records she obtained were thousands of pages long and she needed extra time to review them. We understand how, between the discovery rule and the good faith certificate requirement of Tenn. Code Ann. § 29-26-122, a plaintiff may be pressed for time between the accrual of her claim and the expiration of the statute of limitations. Respectfully, however, every health care liability plaintiff confronts time constraints under the statute of limitations. The question is when Ms. Daffron was put on notice of a claim, not when she secured expert support necessary for her suit. In addition, the standard is an objective one. "Plaintiffs' subjective reactions are not controlling of whether the statute of limitations should be tolled under the discovery rule." *Burk v. RHA/Sullivan, Inc.*, 220 S.W.3d 896, 902 (Tenn. Ct. App. 2006). Ms. Daffron's position effectively would grant plaintiffs the ability to determine unilaterally when the statute of limitation begins to run. That would render the statute of limitations hollow.

We agree with Ms. Daffron that her discovery of Decedent's sores alone does not establish her knowledge beyond a reasonable trier of fact's ability to find otherwise since such sores can develop even in the absence of negligence. However, in December 2013, the same nurse who treated Decedent on November 11, 2013 told Ms. Daffron that she

ought to look into her father's care. Ms. Daffron subsequently did just that. Already upset by Decedent's sores when she knew improper skincare could lead to them and that she had worked hard to prevent her father from getting them, the advice from the nurse and Ms. Daffron's seeking an attorney establishes that she was, by then, on notice. It does not matter if Ms. Daffron was not aware of every detail regarding her father's cause of action. Insofar as Ms. Daffron alleges fraudulent concealment on the part of Memorial, that argument is subsumed into our analysis concluding that she was "aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another." *Sherrill*, 325 S.W.3d at 595. Ms. Daffron then sought, via counsel, Decedent's medical records from Memorial in February 2014. In March 2014, Ms. Daffron obtained the records. At that point, Ms. Daffron was, at the absolute latest, on notice of a claim against Memorial. This was 13 months before she sent pre-suit notice, outside the statute of limitations. Ms. Daffron possessed constructive if not actual knowledge of her father's claim against Memorial more than one year before sending her pre-suit notice, and the complaint was filed outside the statute of limitations. We agree with the Trial Court that no reasonable trier of fact could determine otherwise.

Courts prefer to resolve cases on their merits. We acknowledge this is a harsh result, especially when one considers that Ms. Daffron's knowledge triggering the statute of limitations came about, to a large extent, as a result of her commendable closeness to her father in his last months. Nevertheless, we are constrained to adhere to Tennessee law. By December 2013, when Ms. Daffron sought out a lawyer after the conversation with the nurse, and certainly no later than March 2014 when she obtained Decedent's medical records, Ms. Daffron had everything she needed to ascertain the injury, the wrongful actions, and the responsible party. Applying either date, Ms. Daffron's pre-suit notice and the lawsuit were untimely filed. We hold that Memorial is entitled to judgment as a matter of law. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Teresa M. Daffron, as daughter, next of kin to and as the administrator of the estate of Wiley E. Daffron, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE